(Slip Opinion)          OCTOBER TERM, 2006          1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## GONZALES, ATTORNEY GENERAL *v.* CARHART ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

No. 05–380.  Argued November 8, 2006—Decided April 18, 2007*

Following this Court's *Stenberg* v. *Carhart,* 530 U. S. 914, decision that Nebraska's "partial birth abortion" statute violated the Federal Constitution, as interpreted in *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833, and *Roe* v. *Wade*, 410 U. S. 113, Congress passed the Partial-Birth Abortion Ban Act of 2003 (Act) to proscribe a particular method of ending fetal life in the later stages of pregnancy. The Act does not regulate the most common abortion procedures used in the first trimester of pregnancy, when the vast majority of abortions take place.  In the usual second-trimester procedure, "dilation and evacuation" (D&E), the doctor dilates the cervix and then inserts surgical instruments into the uterus and maneuvers them to grab the fetus and pull it back through the cervix and vagina.  The fetus is usually ripped apart as it is removed, and the doctor may take 10 to 15 passes to remove it in its entirety.  The procedure that prompted the federal Act and various state statutes, including Nebraska's, is a variation of the standard D&E, and is herein referred to as "intact D&E."  The main difference between the two procedures is that in intact D&E a doctor extracts the fetus intact or largely intact with only a few passes, pulling out its entire body instead of ripping it apart. In order to allow the head to pass through the cervix, the doctor typically pierces or crushes the skull.

The Act responded to *Stenberg* in two ways.  First, Congress found that unlike this Court in *Stenberg,* it was not required to accept the District Court's factual findings, and that there was a moral,

———————

*Together with No. 05–1382, *Gonzales, Attorney General* v. *Planned Parenthood Federation of America, Inc., et al.,* on certiorari to the United States Court of Appeals for the Ninth Circuit.

medical, and ethical consensus that partial-birth abortion is a grue-
some and inhumane procedure that is never medically necessary and
should be prohibited. Second, the Act's language differs from that of
the Nebraska statute struck down in *Stenberg.* Among other things,
the Act prohibits "knowingly perform[ing] a partial-birth abortion . . .
that is [not] necessary to save the life of a mother," 18 U. S. C.
§1531(a). It defines "partial-birth abortion," §1531(b)(1), as a proce-
dure in which the doctor: "(A) deliberately and intentionally vaginally
delivers a living fetus until, in the case of a head-first presentation,
the entire fetal head is outside the [mother's] body . . . , or, in the case
of breech presentation, any part of the fetal trunk past the navel is
outside the [mother's] body . . . , for the purpose of performing an
overt act that the person knows will kill the partially delivered living
fetus"; and "(B) performs the overt act, other than completion of de-
livery, that kills the fetus."

   In No. 05–380, respondent abortion doctors challenged the Act's
constitutionality on its face, and the Federal District Court granted a
permanent injunction prohibiting petitioner Attorney General from
enforcing the Act in all cases but those in which there was no dispute
the fetus was viable. The court found the Act unconstitutional be-
cause it (1) lacked an exception allowing the prohibited procedure
where necessary for the mother's health and (2) covered not merely
intact D&E but also other D&Es. Affirming, the Eighth Circuit
found that a lack of consensus existed in the medical community as to
the banned procedure's necessity, and thus *Stenberg* required legisla-
tures to err on the side of protecting women's health by including a
health exception. In No. 05–1382, respondent abortion advocacy
groups brought suit challenging the Act. The District Court enjoined
the Attorney General from enforcing the Act, concluding it was un-
constitutional on its face because it (1) unduly burdened a woman's
ability to choose a second-trimester abortion, (2) was too vague, and
(3) lacked a health exception as required by *Stenberg.* The Ninth
Circuit agreed and affirmed.

*Held:* Respondents have not demonstrated that the Act, as a facial mat-
   ter, is void for vagueness, or that it imposes an undue burden on a
   woman's right to abortion based on its overbreadth or lack of a health
   exception. Pp. 14–39.

   1. The *Casey* Court reaffirmed what it termed *Roe*'s three-part "es-
   sential holding": First, a woman has the right to choose to have an
   abortion before fetal viability and to obtain it without undue interfer-
   ence from the State. Second, the State has the power to restrict abor-
   tions after viability, if the law contains exceptions for pregnancies
   endangering the woman's life or health. And third, the State has le-
   gitimate interests from the pregnancy's outset in protecting the

health of the woman and the life of the fetus that may become a child. 505 U. S., at 846. Though all three are implicated here, it is the third that requires the most extended discussion. In deciding whether the Act furthers the Government's legitimate interest in protecting fetal life, the Court assumes, *inter alia,* that an undue burden on the previability abortion right exists if a regulation's "purpose or effect is to place a substantial obstacle in the [woman's] path," *id.,* at 878, but that "[r]egulations which do no more than create a structural mechanism by which the State . . . may express profound respect for the life of the unborn are permitted, if they are not a substantial obstacle to the woman's exercise of the right to choose," *id.,* at 877. *Casey* struck a balance that was central to its holding, and the Court applies *Casey*'s standard here. A central premise of *Casey*'s joint opinion—that the government has a legitimate, substantial interest in preserving and promoting fetal life—would be repudiated were the Court now to affirm the judgments below. Pp. 14–16.

  2. The Act, on its face, is not void for vagueness and does not impose an undue burden from any overbreadth. Pp. 16–26.

  (a) The Act's text demonstrates that it regulates and proscribes performing the intact D&E procedure. First, since the doctor must "vaginally delive[r] a living fetus," §1531(b)(1)(A), the Act does not restrict abortions involving delivery of an expired fetus or those not involving vaginal delivery, *e.g.,* hysterotomy or hysterectomy. And it applies both previability and postviability because, by common understanding and scientific terminology, a fetus is a living organism within the womb, whether or not it is viable outside the womb. Second, because the Act requires the living fetus to be delivered to a specific anatomical landmark depending on the fetus' presentation, *ibid.,* an abortion not involving such partial delivery is permitted. Third, because the doctor must perform an "overt act, other than completion of delivery, that kills the partially delivered fetus," §1531(b)(1)(B), the "overt act" must be separate from delivery. It must also occur after delivery to an anatomical landmark, since killing "the partially delivered" fetus, when read in context, refers to a fetus that has been so delivered, *ibid.* Fourth, given the Act's scienter requirements, delivery of a living fetus past an anatomical landmark by accident or inadvertence is not a crime because it is not "deliberat[e] and intentiona[l], §1531(b)(1)(A). Nor is such a delivery prohibited if the fetus [has not] been delivered "for the purpose of performing an overt act that the [doctor] knows will kill [it]." *Ibid.* Pp. 16–18.

  (b) The Act is not unconstitutionally vague on its face. It satisfies both requirements of the void-for-vagueness doctrine. First, it provides doctors "of ordinary intelligence a reasonable opportunity to know what is prohibited," *Grayned* v. *City of Rockford*, 408 U. S. 104,

108, setting forth "relatively clear guidelines as to prohibited conduct" and providing "objective criteria" to evaluate whether a doctor has performed a prohibited procedure, *Posters 'N' Things, Ltd.* v. *United States*, 511 U. S. 513, 525–526. Second, it does not encourage arbitrary or discriminatory enforcement. *Kolender* v. *Lawson*, 461 U. S. 352, 357. Its anatomical landmarks "establish minimal guidelines to govern law enforcement," *Smith* v. *Goguen*, 415 U. S. 566, 574, and its scienter requirements narrow the scope of its prohibition and limit prosecutorial discretion, see *Kolender, supra*, at 358. Respondents' arbitrary enforcement arguments, furthermore, are somewhat speculative, since this is a preenforcement challenge. Pp. 18–20.

(c) The Court rejects respondents' argument that the Act imposes an undue burden, as a facial matter, because its restrictions on second-trimester abortions are too broad. Pp. 20–26.

(i) The Act's text discloses that it prohibits a doctor from intentionally performing an intact D&E. Its dual prohibitions correspond with the steps generally undertaken in this procedure: The doctor (1) delivers the fetus until its head lodges in the cervix, usually past the anatomical landmark for a breech presentation, see §1531(b)(1)(A), and (2) proceeds to the overt act of piercing or crushing the fetal skull after the partial delivery, see §1531(b)(1)(B). The Act's scienter requirements limit its reach to those physicians who carry out the intact D&E, with the intent to undertake both steps at the outset. The Act excludes most D&Es in which the doctor intends to remove the fetus in pieces from the outset. This interpretation is confirmed by comparing the Act with the Nebraska statute in *Stenberg*. There, the Court concluded that the statute encompassed D&E, which "often involve[s] a physician pulling a 'substantial portion' of a still living fetus . . . , say, an arm or leg, into the vagina prior to the death of the fetus," 530 U. S., at 939, and rejected the Nebraska Attorney General's limiting interpretation that the statute's reference to a "procedure" that "kill[s] the unborn child" was to a distinct procedure, not to the abortion procedure as a whole, *id.,* at 943. It is apparent Congress responded to these concerns because the Act adopts the phrase "delivers a living fetus," 18 U. S. C. §1531(b)(1)(A), instead of " 'delivering . . . a living unborn child, or a substantial portion thereof,' " 530 U. S., at 938, thereby targeting extraction of an entire fetus rather than removal of fetal pieces; identifies specific anatomical landmarks to which the fetus must be partially delivered, §1531(b)(1)(A), thereby clarifying that the removal of a small portion of the fetus is not prohibited; requires the fetus to be delivered so that it is partially "outside the [mother's] body," §1531(b)(1)(A), thereby establishing that delivering a substantial portion of the fetus into the vagina would not

subject a doctor to criminal sanctions; and adds the overt-act requirement, §1531(b)(1), thereby making the distinction the Nebraska statute failed to draw (but the Nebraska Attorney General advanced). Finally, the canon of constitutional avoidance, see, *e.g., Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council*, 485 U. S. 568, 575, extinguishes any lingering doubt. Interpreting the Act not to prohibit standard D&E is the most reasonable reading and understanding of its terms. Pp. 20–24.

(ii) Respondents' contrary arguments are unavailing. The contention that any D&E may result in the delivery of a living fetus beyond the Act's anatomical landmarks because doctors cannot predict the amount the cervix will dilate before the procedure does not take account of the Act's intent requirements, which preclude liability for an accidental intact D&E. The evidence supports the legislative determination that an intact delivery is almost always a conscious choice rather than a happenstance, belying any claim that a standard D&E cannot be performed without intending or foreseeing an intact D&E. That many doctors begin every D&E with the objective of removing the fetus as intact as possible based on their belief that this is safer does not prove, as respondents suggest, that every D&E might violate the Act, thereby imposing an undue burden. It demonstrates only that those doctors must adjust their conduct to the law by not attempting to deliver the fetus to an anatomical landmark. Respondents have not shown that requiring doctors to intend dismemberment before such a delivery will prohibit the vast majority of D&E abortions. Pp. 24–26.

3. The Act, measured by its text in this facial attack, does not impose a "substantial obstacle" to late-term, but previability, abortions, as prohibited by the *Casey* plurality, 505 U. S., at 878. Pp. 26–37.

(a) The contention that the Act's congressional purpose was to create such an obstacle is rejected. The Act's stated purposes are protecting innocent human life from a brutal and inhumane procedure and protecting the medical community's ethics and reputation. The government undoubtedly "has an interest in protecting the integrity and ethics of the medical profession." *Washington* v. *Glucksberg*, 521 U. S. 702, 731. Moreover, *Casey* reaffirmed that the government may use its voice and its regulatory authority to show its profound respect for the life within the woman. See, *e.g.,* 505 U. S., at 873. The Act's ban on abortions involving partial delivery of a living fetus furthers the Government's objectives. Congress determined that such abortions are similar to the killing of a newborn infant. This Court has confirmed the validity of drawing boundaries to prevent practices that extinguish life and are close to actions that are condemned. *Glucksberg, supra,* at 732–735, and n. 23. The Act also

recognizes that respect for human life finds an ultimate expression in a mother's love for her child. Whether to have an abortion requires a difficult and painful moral decision, *Casey,* 505 U. S., at 852–853, which some women come to regret. In a decision so fraught with emotional consequence, some doctors may prefer not to disclose precise details of the abortion procedure to be used. It is, however, precisely this lack of information that is of legitimate concern to the State. *Id.,* at 873. The State's interest in respect for life is advanced by the dialogue that better informs the political and legal systems, the medical profession, expectant mothers, and society as a whole of the consequences that follow from a decision to elect a late-term abortion. The objection that the Act accomplishes little because the standard D&E is in some respects as brutal, if not more, than intact D&E, is unpersuasive. It was reasonable for Congress to think that partial-birth abortion, more than standard D&E, undermines the public's perception of the doctor's appropriate role during delivery, and perverts the birth process. Pp. 26–30.

(b) The Act's failure to allow the banned procedure's use where " 'necessary, in appropriate medical judgment, for preservation of the [mother's] health,' " *Ayotte* v. *Planned Parenthood of Northern New Eng.*, 546 U. S. 320, 327–328, does not have the effect of imposing an unconstitutional burden on the abortion right. The Court assumes the Act's prohibition would be unconstitutional, under controlling precedents, if it "subject[ed] [women] to significant health risks." *Id.,* at 328. Whether the Act creates such risks was, however, a contested factual question below: The evidence presented in the trial courts and before Congress demonstrates both sides have medical support for their positions. The Court's precedents instruct that the Act can survive facial attack when this medical uncertainty persists. See, *e.g., Kansas* v. *Hendricks*, 521 U. S. 346, 360, n. 3. This traditional rule is consistent with *Casey*, which confirms both that the State has an interest in promoting respect for human life at all stages in the pregnancy, and that abortion doctors should be treated the same as other doctors. Medical uncertainty does not foreclose the exercise of legislative power in the abortion context any more than it does in other contexts. Other considerations also support the Court's conclusion, including the fact that safe alternatives to the prohibited procedure, such as D&E, are available. In addition, if intact D&E is truly necessary in some circumstances, a prior injection to kill the fetus allows a doctor to perform the procedure, given that the Act's prohibition only applies to the delivery of "a living fetus," 18 U. S. C. §1531(b)(1)(A). *Planned Parenthood of Central Mo.* v. *Danforth*, 428 U. S. 52, 77–79, distinguished. The Court rejects certain of the parties' arguments. On the one hand, the Attorney General's contention that the Act

Syllabus

should be upheld based on the congressional findings alone fails because some of the Act's recitations are factually incorrect and some of the important findings have been superseded. Also unavailing, however, is respondents' contention that an abortion regulation must contain a health exception if "substantial medical authority supports the proposition that banning a particular procedure could endanger women's health," *Stenberg*, 530 U. S., at 938. Interpreting *Stenberg* as leaving no margin for legislative error in the face of medical uncertainty is too exacting a standard. Marginal safety considerations, including the balance of risks, are within the legislative competence where, as here, the regulation is rational and pursues legitimate ends, and standard, safe medical options are available. Pp. 31–37.

4. These facial attacks should not have been entertained in the first instance. In these circumstances the proper means to consider exceptions is by as-applied challenge. Cf. *Wisconsin Right to Life, Inc.* v. *Federal Election Comm'n*, 546 U. S. \_\_\_, \_\_\_. This is the proper manner to protect the woman's health if it can be shown that in discrete and well-defined instances a condition has or is likely to occur in which the procedure prohibited by the Act must be used. No as-applied challenge need be brought if the Act's prohibition threatens a woman's life, because the Act already contains a life exception. 18 U. S. C. §1531(a). Pp. 37–39.

No. 05–380, 413 F. 3d 791; 05–1382, 435 F. 3d 1163, reversed.

KENNEDY, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, THOMAS, and ALITO, JJ., joined. THOMAS, J., filed a concurring opinion, in which SCALIA, J., joined. GINSBURG, J., filed a dissenting opinion, in which STEVENS, SOUTER, and BREYER, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

-------------------

Nos. 05–380 and 05–1382

-------------------

### ALBERTO R. GONZALES, ATTORNEY GENERAL, PETITIONER

05–380                          *v.*

### LEROY CARHART ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

### ALBERTO R. GONZALES, ATTORNEY GENERAL, PETITIONER

05–1382                         *v.*

### PLANNED PARENTHOOD FEDERATION OF AMERICA, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[April 18, 2007]

JUSTICE KENNEDY delivered the opinion of the Court.

These cases require us to consider the validity of the Partial-Birth Abortion Ban Act of 2003 (Act), 18 U. S. C. §1531 (2000 ed., Supp. IV), a federal statute regulating abortion procedures. In recitations preceding its operative provisions the Act refers to the Court's opinion in *Stenberg* v. *Carhart*, 530 U. S. 914 (2000), which also addressed the subject of abortion procedures used in the later stages of pregnancy. Compared to the state statute at issue in *Stenberg*, the Act is more specific concerning the instances

to which it applies and in this respect more precise in its coverage. We conclude the Act should be sustained against the objections lodged by the broad, facial attack brought against it.

In No. 05–380 *(Carhart)* respondents are LeRoy Carhart, William G. Fitzhugh, William H. Knorr, and Jill L. Vibhakar, doctors who perform second-trimester abortions. These doctors filed their complaint against the Attorney General of the United States in the United States District Court for the District of Nebraska. They challenged the constitutionality of the Act and sought a permanent injunction against its enforcement. *Carhart* v. *Ashcroft*, 331 F. Supp. 2d 805 (2004). In 2004, after a 2-week trial, the District Court granted a permanent injunction that prohibited the Attorney General from enforcing the Act in all cases but those in which there was no dispute the fetus was viable. *Id.,* at 1048. The Court of Appeals for the Eighth Circuit affirmed. 413 F. 3d 791 (2005). We granted certiorari. 546 U. S. 1169 (2006).

In No. 05–1382 *(Planned Parenthood)* respondents are Planned Parenthood Federation of America, Inc., Planned Parenthood Golden Gate, and the City and County of San Francisco. The Planned Parenthood entities sought to enjoin enforcement of the Act in a suit filed in the United States District Court for the Northern District of California. *Planned Parenthood Federation of Am.* v. *Ashcroft*, 320 F. Supp. 2d 957 (2004). The City and County of San Francisco intervened as a plaintiff. In 2004, the District Court held a trial spanning a period just short of three weeks, and it, too, enjoined the Attorney General from enforcing the Act. *Id.,* at 1035. The Court of Appeals for the Ninth Circuit affirmed. 435 F. 3d 1163 (2006). We granted certiorari. 547 U. S. ___ (2006).

# I

## A

The Act proscribes a particular manner of ending fetal life, so it is necessary here, as it was in *Stenberg*, to discuss abortion procedures in some detail. Three United States District Courts heard extensive evidence describing the procedures. In addition to the two courts involved in the instant cases the District Court for the Southern District of New York also considered the constitutionality of the Act. *Nat. Abortion Federation* v. *Ashcroft*, 330 F. Supp. 2d 436 (2004). It found the Act unconstitutional, *id.,* at 493, and the Court of Appeals for the Second Circuit affirmed, *Nat. Abortion Federation* v. *Gonzales*, 437 F. 3d 278 (2006). The three District Courts relied on similar medical evidence; indeed, much of the evidence submitted to the *Carhart* court previously had been submitted to the other two courts. 331 F. Supp. 2d, at 809–810. We refer to the District Courts' exhaustive opinions in our own discussion of abortion procedures.

Abortion methods vary depending to some extent on the preferences of the physician and, of course, on the term of the pregnancy and the resulting stage of the unborn child's development. Between 85 and 90 percent of the approximately 1.3 million abortions performed each year in the United States take place in the first three months of pregnancy, which is to say in the first trimester. *Planned Parenthood*, 320 F. Supp. 2d, at 960, and n. 4; App. in No. 05–1382, pp. 45–48. The most common first-trimester abortion method is vacuum aspiration (otherwise known as suction curettage) in which the physician vacuums out the embryonic tissue. Early in this trimester an alternative is to use medication, such as mifepristone (commonly known as RU–486), to terminate the pregnancy. *Nat. Abortion Federation, supra,* at 464, n. 20. The Act does not regulate these procedures.

Of the remaining abortions that take place each year,

most occur in the second trimester. The surgical proce-
dure referred to as "dilation and evacuation" or "D&E" is
the usual abortion method in this trimester. *Planned
Parenthood*, 320 F. Supp. 2d, at 960–961. Although indi-
vidual techniques for performing D&E differ, the general
steps are the same.

A doctor must first dilate the cervix at least to the ex-
tent needed to insert surgical instruments into the uterus
and to maneuver them to evacuate the fetus. *Nat. Abor-
tion Federation, supra*, at 465; App. in No. 05–1382, at 61.
The steps taken to cause dilation differ by physician and
gestational age of the fetus. See, *e.g., Carhart*, 331
F. Supp. 2d, at 852, 856, 859, 862–865, 868, 870, 873–874,
876–877, 880, 883, 886. A doctor often begins the dilation
process by inserting osmotic dilators, such as laminaria
(sticks of seaweed), into the cervix. The dilators can be
used in combination with drugs, such as misoprostol, that
increase dilation. The resulting amount of dilation is not
uniform, and a doctor does not know in advance how an
individual patient will respond. In general the longer
dilators remain in the cervix, the more it will dilate. Yet
the length of time doctors employ osmotic dilators varies.
Some may keep dilators in the cervix for two days, while
others use dilators for a day or less. *Nat. Abortion Federa-
tion, supra*, at 464–465; *Planned Parenthood, supra*, at
961.

After sufficient dilation the surgical operation can com-
mence. The woman is placed under general anesthesia or
conscious sedation. The doctor, often guided by ultra-
sound, inserts grasping forceps through the woman's
cervix and into the uterus to grab the fetus. The doctor
grips a fetal part with the forceps and pulls it back
through the cervix and vagina, continuing to pull even
after meeting resistance from the cervix. The friction
causes the fetus to tear apart. For example, a leg might be
ripped off the fetus as it is pulled through the cervix and

out of the woman. The process of evacuating the fetus piece by piece continues until it has been completely removed. A doctor may make 10 to 15 passes with the forceps to evacuate the fetus in its entirety, though sometimes removal is completed with fewer passes. Once the fetus has been evacuated, the placenta and any remaining fetal material are suctioned or scraped out of the uterus. The doctor examines the different parts to ensure the entire fetal body has been removed. See, *e.g., Nat. Abortion Federation, supra*, at 465; *Planned Parenthood, supra*, at 962.

Some doctors, especially later in the second trimester, may kill the fetus a day or two before performing the surgical evacuation. They inject digoxin or potassium chloride into the fetus, the umbilical cord, or the amniotic fluid. Fetal demise may cause contractions and make greater dilation possible. Once dead, moreover, the fetus' body will soften, and its removal will be easier. Other doctors refrain from injecting chemical agents, believing it adds risk with little or no medical benefit. *Carhart, supra*, at 907–912; *Nat. Abortion Federation, supra*, at 474–475.

The abortion procedure that was the impetus for the numerous bans on "partial-birth abortion," including the Act, is a variation of this standard D&E. See M. Haskell, Dilation and Extraction for Late Second Trimester Abortion (1992), 1 Appellant's App. in No. 04–3379 (CA8), p. 109 (hereinafter Dilation and Extraction). The medical community has not reached unanimity on the appropriate name for this D&E variation. It has been referred to as "intact D&E," "dilation and extraction" (D&X), and "intact D&X." *Nat. Abortion Federation, supra*, at 440, n. 2; see also F. Cunningham et al., Williams Obstetrics 243 (22d ed. 2005) (identifying the procedure as D&X); Danforth's Obstetrics and Gynecology 567 (J. Scott, R. Gibbs, B. Karlan, & A. Haney eds. 9th ed. 2003) (identifying the procedure as intact D&X); M. Paul, E. Lichtenberg, L.

Borgatta, D. Grimes, & P. Stubblefield, A Clinician's Guide to Medical and Surgical Abortion 136 (1999) (identifying the procedure as intact D&E). For discussion purposes this D&E variation will be referred to as intact D&E. The main difference between the two procedures is that in intact D&E a doctor extracts the fetus intact or largely intact with only a few passes. There are no comprehensive statistics indicating what percentage of all D&Es are performed in this manner.

Intact D&E, like regular D&E, begins with dilation of the cervix. Sufficient dilation is essential for the procedure. To achieve intact extraction some doctors thus may attempt to dilate the cervix to a greater degree. This approach has been called "serial" dilation. *Carhart, supra*, at 856, 870, 873; *Planned Parenthood, supra*, at 965. Doctors who attempt at the outset to perform intact D&E may dilate for two full days or use up to 25 osmotic dilators. See, *e.g.,* Dilation and Extraction 110; *Carhart, supra*, at 865, 868, 876, 886.

In an intact D&E procedure the doctor extracts the fetus in a way conducive to pulling out its entire body, instead of ripping it apart. One doctor, for example, testified:

> "If I know I have good dilation and I reach in and the fetus starts to come out and I think I can accomplish it, the abortion with an intact delivery, then I use my forceps a little bit differently. I don't close them quite so much, and I just gently draw the tissue out attempting to have an intact delivery, if possible." App. in No. 05–1382, at 74.

Rotating the fetus as it is being pulled decreases the odds of dismemberment. *Carhart, supra*, at 868–869; App. in No. 05–380, pp. 40–41; 5 Appellant's App. in No. 04–3379 (CA8), p. 1469. A doctor also "may use forceps to grasp a fetal part, pull it down, and re-grasp the fetus at a higher level—sometimes using both his hand and a forceps—to

exert traction to retrieve the fetus intact until the head is lodged in the [cervix]." *Carhart*, 331 F. Supp. 2d, at 886– 887.

Intact D&E gained public notoriety when, in 1992, Dr. Martin Haskell gave a presentation describing his method of performing the operation. Dilation and Extraction 110– 111. In the usual intact D&E the fetus' head lodges in the cervix, and dilation is insufficient to allow it to pass. See, *e.g., ibid.;* App. in No. 05–380, at 577; App. in No. 05– 1382, at 74, 282. Haskell explained the next step as follows:

> "'At this point, the right-handed surgeon slides the fingers of the left [hand] along the back of the fetus and "hooks" the shoulders of the fetus with the index and ring fingers (palm down).
>
> "'While maintaining this tension, lifting the cervix and applying traction to the shoulders with the fingers of the left hand, the surgeon takes a pair of blunt curved Metzenbaum scissors in the right hand. He carefully advances the tip, curved down, along the spine and under his middle finger until he feels it contact the base of the skull under the tip of his middle finger.
>
> "'[T]he surgeon then forces the scissors into the base of the skull or into the foramen magnum. Having safely entered the skull, he spreads the scissors to enlarge the opening.
>
> "'The surgeon removes the scissors and introduces a suction catheter into this hole and evacuates the skull contents. With the catheter still in place, he applies traction to the fetus, removing it completely from the patient.'" H. R. Rep. No. 108–58, p. 3 (2003).

This is an abortion doctor's clinical description. Here is another description from a nurse who witnessed the same method performed on a 26½-week fetus and who testified

before the Senate Judiciary Committee:

> "'Dr. Haskell went in with forceps and grabbed the baby's legs and pulled them down into the birth canal. Then he delivered the baby's body and the arms—everything but the head.  The doctor kept the head right inside the uterus. . . .
>
> "'The baby's little fingers were clasping and unclasping, and his little feet were kicking.  Then the doctor stuck the scissors in the back of his head, and the baby's arms jerked out, like a startle reaction, like a flinch, like a baby does when he thinks he is going to fall.
>
> "'The doctor opened up the scissors, stuck a high-powered suction tube into the opening, and sucked the baby's brains out.  Now the baby went completely limp. . . .
>
> "'He cut the umbilical cord and delivered the placenta.  He threw the baby in a pan, along with the placenta and the instruments he had just used.'"  *Ibid.*

Dr. Haskell's approach is not the only method of killing the fetus once its head lodges in the cervix, and "the process has evolved" since his presentation. *Planned Parenthood*, 320 F. Supp. 2d, at 965.  Another doctor, for example, squeezes the skull after it has been pierced "so that enough brain tissue exudes to allow the head to pass through."  App. in No. 05–380, at 41; see also *Carhart, supra,* at 866–867, 874.  Still other physicians reach into the cervix with their forceps and crush the fetus' skull. *Carhart, supra*, at 858, 881.  Others continue to pull the fetus out of the woman until it disarticulates at the neck, in effect decapitating it.  These doctors then grasp the head with forceps, crush it, and remove it.  *Id.,* at 864, 878; see also *Planned Parenthood, supra*, at 965.

Some doctors performing an intact D&E attempt to

remove the fetus without collapsing the skull. See *Carhart, supra*, at 866, 869. Yet one doctor would not allow delivery of a live fetus younger than 24 weeks because "the objective of [his] procedure is to perform an abortion," not a birth. App. in No. 05–1382, at 408–409. The doctor thus answered in the affirmative when asked whether he would "hold the fetus' head on the internal side of the [cervix] in order to collapse the skull" and kill the fetus before it is born. *Id.,* at 409; see also *Carhart, supra*, at 862, 878. Another doctor testified he crushes a fetus' skull not only to reduce its size but also to ensure the fetus is dead before it is removed. For the staff to have to deal with a fetus that has "some viability to it, some movement of limbs," according to this doctor, "[is] always a difficult situation." App. in No. 05–380, at 94; see *Carhart, supra*, at 858.

D&E and intact D&E are not the only second-trimester abortion methods. Doctors also may abort a fetus through medical induction. The doctor medicates the woman to induce labor, and contractions occur to deliver the fetus. Induction, which unlike D&E should occur in a hospital, can last as little as 6 hours but can take longer than 48. It accounts for about five percent of second-trimester abortions before 20 weeks of gestation and 15 percent of those after 20 weeks. Doctors turn to two other methods of second-trimester abortion, hysterotomy and hysterectomy, only in emergency situations because they carry increased risk of complications. In a hysterotomy, as in a cesarean section, the doctor removes the fetus by making an incision through the abdomen and uterine wall to gain access to the uterine cavity. A hysterectomy requires the removal of the entire uterus. These two procedures represent about .07% of second-trimester abortions. *Nat. Abortion Federation*, 330 F. Supp. 2d, at 467; *Planned Parenthood, supra*, at 962–963.

B

After Dr. Haskell's procedure received public attention, with ensuing and increasing public concern, bans on "'partial birth abortion'" proliferated. By the time of the *Stenberg* decision, about 30 States had enacted bans designed to prohibit the procedure. 530 U. S., at 995–996, and nn. 12–13 (THOMAS, J., dissenting); see also H. R. Rep. No. 108–58, at 4–5. In 1996, Congress also acted to ban partial-birth abortion. President Clinton vetoed the congressional legislation, and the Senate failed to override the veto. Congress approved another bill banning the procedure in 1997, but President Clinton again vetoed it. In 2003, after this Court's decision in *Stenberg*, Congress passed the Act at issue here. H. R. Rep. No. 108–58, at 12–14. On November 5, 2003, President Bush signed the Act into law. It was to take effect the following day. 18 U. S. C. §1531(a) (2000 ed., Supp. IV).

The Act responded to *Stenberg* in two ways. First, Congress made factual findings. Congress determined that this Court in *Stenberg* "was required to accept the very questionable findings issued by the district court judge," §2(7), 117 Stat. 1202, notes following 18 U. S. C. §1531 (2000 ed., Supp. IV), p. 768, ¶(7) (Congressional Findings), but that Congress was "not bound to accept the same factual findings," *ibid.,* ¶(8). Congress found, among other things, that "[a] moral, medical, and ethical consensus exists that the practice of performing a partial-birth abortion . . . is a gruesome and inhumane procedure that is never medically necessary and should be prohibited." *Id.,* at 767, ¶(1).

Second, and more relevant here, the Act's language differs from that of the Nebraska statute struck down in *Stenberg*. See 530 U. S., at 921–922 (quoting Neb. Rev. Stat. Ann. §§28–328(1), 28–326(9) (Supp. 1999)). The operative provisions of the Act provide in relevant part:

"(a) Any physician who, in or affecting interstate or foreign commerce, knowingly performs a partial-birth abortion and thereby kills a human fetus shall be fined under this title or imprisoned not more than 2 years, or both. This subsection does not apply to a partial-birth abortion that is necessary to save the life of a mother whose life is endangered by a physical disorder, physical illness, or physical injury, including a life-endangering physical condition caused by or arising from the pregnancy itself. This subsection takes effect 1 day after the enactment.

"(b) As used in this section—

"(1) the term 'partial-birth abortion' means an abortion in which the person performing the abortion—

"(A) deliberately and intentionally vaginally delivers a living fetus until, in the case of a head-first presentation, the entire fetal head is outside the body of the mother, or, in the case of breech presentation, any part of the fetal trunk past the navel is outside the body of the mother, for the purpose of performing an overt act that the person knows will kill the partially delivered living fetus; and

"(B) performs the overt act, other than completion of delivery, that kills the partially delivered living fetus; and

"(2) the term 'physician' means a doctor of medicine or osteopathy legally authorized to practice medicine and surgery by the State in which the doctor performs such activity, or any other individual legally authorized by the State to perform abortions: *Provided, however,* That any individual who is not a physician or not otherwise legally authorized by the State to perform abortions, but who nevertheless directly performs a partial-birth abortion, shall be subject to the provisions of this section.

.          .          .          .          .

"(d)(1) A defendant accused of an offense under this section may seek a hearing before the State Medical Board on whether the physician's conduct was necessary to save the life of the mother whose life was endangered by a physical disorder, physical illness, or physical injury, including a life-endangering physical condition caused by or arising from the pregnancy itself.

"(2) The findings on that issue are admissible on that issue at the trial of the defendant. Upon a motion of the defendant, the court shall delay the beginning of the trial for not more than 30 days to permit such a hearing to take place.

"(e) A woman upon whom a partial-birth abortion is performed may not be prosecuted under this section, for a conspiracy to violate this section, or for an offense under section 2, 3, or 4 of this title based on a violation of this section." 18 U. S. C. §1531 (2000 ed., Supp. IV).

The Act also includes a provision authorizing civil actions that is not of relevance here. §1531(c).

## C

The District Court in *Carhart* concluded the Act was unconstitutional for two reasons. First, it determined the Act was unconstitutional because it lacked an exception allowing the procedure where necessary for the health of the mother. 331 F. Supp. 2d, at 1004–1030. Second, the District Court found the Act deficient because it covered not merely intact D&E but also certain other D&Es. *Id.,* at 1030–1037.

The Court of Appeals for the Eighth Circuit addressed only the lack of a health exception. 413 F. 3d, at 803–804. The court began its analysis with what it saw as the appropriate question—"whether 'substantial medical authority' supports the medical necessity of the banned proce-

dure." *Id.,* at 796 (quoting *Stenberg,* 530 U. S., at 938). This was the proper framework, according to the Court of Appeals, because "when a lack of consensus exists in the medical community, the Constitution requires legislatures to err on the side of protecting women's health by including a health exception." 413 F. 3d, at 796. The court rejected the Attorney General's attempt to demonstrate changed evidentiary circumstances since *Stenberg* and considered itself bound by *Stenberg*'s conclusion that a health exception was required. 413 F. 3d, at 803 (explaining "[t]he record in [the] case and the record in *Stenberg* [were] similar in all significant respects"). It invalidated the Act. *Ibid.*

D

The District Court in *Planned Parenthood* concluded the Act was unconstitutional "because it (1) pose[d] an undue burden on a woman's ability to choose a second trimester abortion; (2) [was] unconstitutionally vague; and (3) require[d] a health exception as set forth by . . . *Stenberg.*" 320 F. Supp. 2d, at 1034–1035.

The Court of Appeals for the Ninth Circuit agreed. Like the Court of Appeals for the Eighth Circuit, it concluded the absence of a health exception rendered the Act unconstitutional. The court interpreted *Stenberg* to require a health exception unless "there is *consensus in the medical community* that the banned procedure is never medically necessary to preserve the health of women." 435 F. 3d, at 1173. Even after applying a deferential standard of review to Congress' factual findings, the Court of Appeals determined "substantial disagreement exists in the medical community regarding whether" the procedures prohibited by the Act are ever necessary to preserve a woman's health. *Id.*, at 1175–1176.

The Court of Appeals concluded further that the Act placed an undue burden on a woman's ability to obtain a

second-trimester abortion. The court found the textual differences between the Act and the Nebraska statute struck down in *Stenberg* insufficient to distinguish D&E and intact D&E. 435 F. 3d, at 1178–1180. As a result, according to the Court of Appeals, the Act imposed an undue burden because it prohibited D&E. *Id.*, at 1180–1181.

Finally, the Court of Appeals found the Act void for vagueness. *Id.,* at 1181. Abortion doctors testified they were uncertain which procedures the Act made criminal. The court thus concluded the Act did not offer physicians clear warning of its regulatory reach. *Id.,* at 1181–1184. Resting on its understanding of the remedial framework established by this Court in *Ayotte* v. *Planned Parenthood of Northern New Eng.*, 546 U. S. 320, 328–330 (2006), the Court of Appeals held the Act was unconstitutional on its face and should be permanently enjoined. 435 F. 3d, at 1184–1191.

## II

The principles set forth in the joint opinion in *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833 (1992), did not find support from all those who join the instant opinion. See *id.,* at 979–1002 (SCALIA, J., joined by THOMAS, J., *inter alios,* concurring in judgment in part and dissenting in part). Whatever one's views concerning the *Casey* joint opinion, it is evident a premise central to its conclusion—that the government has a legitimate and substantial interest in preserving and promoting fetal life—would be repudiated were the Court now to affirm the judgments of the Courts of Appeals.

*Casey* involved a challenge to *Roe* v. *Wade*, 410 U. S. 113 (1973). The opinion contains this summary:

> "It must be stated at the outset and with clarity that *Roe*'s essential holding, the holding we reaffirm, has three parts. First is a recognition of the right of

the woman to choose to have an abortion before viability and to obtain it without undue interference from the State. Before viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure. Second is a confirmation of the State's power to restrict abortions after fetal viability, if the law contains exceptions for pregnancies which endanger the woman's life or health. And third is the principle that the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child. These principles do not contradict one another; and we adhere to each." 505 U. S., at 846 (opinion of the Court).

Though all three holdings are implicated in the instant cases, it is the third that requires the most extended discussion; for we must determine whether the Act furthers the legitimate interest of the Government in protecting the life of the fetus that may become a child.

To implement its holding, *Casey* rejected both *Roe*'s rigid trimester framework and the interpretation of *Roe* that considered all previability regulations of abortion unwarranted. 505 U. S., at 875–876, 878 (plurality opinion). On this point *Casey* overruled the holdings in two cases because they undervalued the State's interest in potential life. See *id.,* at 881–883 (joint opinion) (overruling *Thornburgh* v. *American College of Obstetricians and Gynecologists*, 476 U. S. 747 (1986) and *Akron* v. *Akron Center for Reproductive Health, Inc.*, 462 U. S. 416 (1983)).

We assume the following principles for the purposes of this opinion. Before viability, a State "may not prohibit any woman from making the ultimate decision to terminate her pregnancy." 505 U. S., at 879 (plurality opinion). It also may not impose upon this right an undue burden,

which exists if a regulation's "purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." *Id.,* at 878. On the other hand, "[r]egulations which do no more than create a structural mechanism by which the State, or the parent or guardian of a minor, may express profound respect for the life of the unborn are permitted, if they are not a substantial obstacle to the woman's exercise of the right to choose." *Id.,* at 877. *Casey*, in short, struck a balance. The balance was central to its holding. We now apply its standard to the cases at bar.

## III

We begin with a determination of the Act's operation and effect. A straightforward reading of the Act's text demonstrates its purpose and the scope of its provisions: It regulates and proscribes, with exceptions or qualifications to be discussed, performing the intact D&E procedure.

Respondents agree the Act encompasses intact D&E, but they contend its additional reach is both unclear and excessive. Respondents assert that, at the least, the Act is void for vagueness because its scope is indefinite. In the alternative, respondents argue the Act's text proscribes all D&Es. Because D&E is the most common second-trimester abortion method, respondents suggest the Act imposes an undue burden. In this litigation the Attorney General does not dispute that the Act would impose an undue burden if it covered standard D&E.

We conclude that the Act is not void for vagueness, does not impose an undue burden from any overbreadth, and is not invalid on its face.

## A

The Act punishes "knowingly perform[ing]" a "partial-birth abortion." §1531(a) (2000 ed., Supp. IV). It defines the unlawful abortion in explicit terms. §1531(b)(1).

First, the person performing the abortion must "vaginally delive[r] a living fetus." §1531(b)(1)(A). The Act does not restrict an abortion procedure involving the delivery of an expired fetus. The Act, furthermore, is inapplicable to abortions that do not involve vaginal delivery (for instance, hysterotomy or hysterectomy). The Act does apply both previability and postviability because, by common understanding and scientific terminology, a fetus is a living organism while within the womb, whether or not it is viable outside the womb. See, *e.g., Planned Parenthood*, 320 F. Supp. 2d, at 971–972. We do not understand this point to be contested by the parties.

Second, the Act's definition of partial-birth abortion requires the fetus to be delivered "until, in the case of a head-first presentation, the entire fetal head is outside the body of the mother, or, in the case of breech presentation, any part of the fetal trunk past the navel is outside the body of the mother." §1531(b)(1)(A) (2000 ed., Supp. IV). The Attorney General concedes, and we agree, that if an abortion procedure does not involve the delivery of a living fetus to one of these "anatomical 'landmarks'"—where, depending on the presentation, either the fetal head or the fetal trunk past the navel is outside the body of the mother—the prohibitions of the Act do not apply. Brief for Petitioner in No. 05–380, p. 46.

Third, to fall within the Act, a doctor must perform an "overt act, other than completion of delivery, that kills the partially delivered living fetus." §1531(b)(1)(B) (2000 ed., Supp. IV). For purposes of criminal liability, the overt act causing the fetus' death must be separate from delivery. And the overt act must occur after the delivery to an anatomical landmark. This is because the Act proscribes killing "the partially delivered" fetus, which, when read in context, refers to a fetus that has been delivered to an anatomical landmark. *Ibid.*

Fourth, the Act contains scienter requirements concern-

ing all the actions involved in the prohibited abortion. To begin with, the physician must have "deliberately and intentionally" delivered the fetus to one of the Act's anatomical landmarks. §1531(b)(1)(A). If a living fetus is delivered past the critical point by accident or inadvertence, the Act is inapplicable. In addition, the fetus must have been delivered "for the purpose of performing an overt act that the [doctor] knows will kill [it]." *Ibid.* If either intent is absent, no crime has occurred. This follows from the general principle that where scienter is required no crime is committed absent the requisite state of mind. See generally 1 W. LaFave, Substantive Criminal Law §5.1 (2d ed. 2003) (hereinafter LaFave); 1 C. Torcia, Wharton's Criminal Law §27 (15th ed. 1993).

### B

Respondents contend the language described above is indeterminate, and they thus argue the Act is unconstitutionally vague on its face. "As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender* v. *Lawson*, 461 U. S. 352, 357 (1983); *Posters 'N' Things, Ltd.* v. *United States*, 511 U. S. 513, 525 (1994). The Act satisfies both requirements.

The Act provides doctors "of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned* v. *City of Rockford*, 408 U. S. 104, 108 (1972). Indeed, it sets forth "relatively clear guidelines as to prohibited conduct" and provides "objective criteria" to evaluate whether a doctor has performed a prohibited procedure. *Posters 'N' Things, supra*, at 525–526. Unlike the statutory language in *Stenberg* that prohibited the delivery of a "'substantial portion'" of the fetus—where a doc-

tor might question how much of the fetus is a substantial portion—the Act defines the line between potentially criminal conduct on the one hand and lawful abortion on the other. *Stenberg*, 530 U. S., at 922 (quoting Neb. Rev. Stat. Ann. §28–326(9) (Supp. 1999)). Doctors performing D&E will know that if they do not deliver a living fetus to an anatomical landmark they will not face criminal liability.

This conclusion is buttressed by the intent that must be proved to impose liability. The Court has made clear that scienter requirements alleviate vagueness concerns. *Posters 'N' Things, supra*, at 526; see also *Colautti* v. *Franklin*, 439 U. S. 379, 395 (1979) ("This Court has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea*"). The Act requires the doctor deliberately to have delivered the fetus to an anatomical landmark. §1531(b)(1)(A) (2000 ed., Supp. IV). Because a doctor performing a D&E will not face criminal liability if he or she delivers a fetus beyond the prohibited point by mistake, the Act cannot be described as "a trap for those who act in good faith." *Colautti, supra*, at 395 (internal quotation marks omitted).

Respondents likewise have failed to show that the Act should be invalidated on its face because it encourages arbitrary or discriminatory enforcement. *Kolender, supra*, at 357. Just as the Act's anatomical landmarks provide doctors with objective standards, they also "establish minimal guidelines to govern law enforcement." *Smith* v. *Goguen*, 415 U. S. 566, 574 (1974). The scienter requirements narrow the scope of the Act's prohibition and limit prosecutorial discretion. It cannot be said that the Act "vests virtually complete discretion in the hands of [law enforcement] to determine whether the [doctor] has satisfied [its provisions]." *Kolender, supra*, at 358 (invalidating a statute regulating loitering). Respondents' arguments

concerning arbitrary enforcement, furthermore, are somewhat speculative. This is a preenforcement challenge, where "no evidence has been, or could be, introduced to indicate whether the [Act] has been enforced in a discriminatory manner or with the aim of inhibiting [constitutionally protected conduct]." *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, 455 U. S. 489, 503 (1982). The Act is not vague.

C

We next determine whether the Act imposes an undue burden, as a facial matter, because its restrictions on second-trimester abortions are too broad. A review of the statutory text discloses the limits of its reach. The Act prohibits intact D&E; and, notwithstanding respondents' arguments, it does not prohibit the D&E procedure in which the fetus is removed in parts.

1

The Act prohibits a doctor from intentionally performing an intact D&E. The dual prohibitions of the Act, both of which are necessary for criminal liability, correspond with the steps generally undertaken during this type of procedure. First, a doctor delivers the fetus until its head lodges in the cervix, which is usually past the anatomical landmark for a breech presentation. See 18 U. S. C. §1531(b)(1)(A) (2000 ed., Supp. IV). Second, the doctor proceeds to pierce the fetal skull with scissors or crush it with forceps. This step satisfies the overt-act requirement because it kills the fetus and is distinct from delivery. See §1531(b)(1)(B). The Act's intent requirements, however, limit its reach to those physicians who carry out the intact D&E after intending to undertake both steps at the outset.

The Act excludes most D&Es in which the fetus is removed in pieces, not intact. If the doctor intends to remove the fetus in parts from the outset, the doctor will not

have the requisite intent to incur criminal liability. A doctor performing a standard D&E procedure can often "tak[e] about 10–15 'passes' through the uterus to remove the entire fetus." *Planned Parenthood*, 320 F. Supp. 2d, at 962. Removing the fetus in this manner does not violate the Act because the doctor will not have delivered the living fetus to one of the anatomical landmarks or committed an additional overt act that kills the fetus after partial delivery. §1531(b)(1) (2000 ed., Supp. IV).

A comparison of the Act with the Nebraska statute struck down in *Stenberg* confirms this point. The statute in *Stenberg* prohibited "'deliberately and intentionally delivering into the vagina a living unborn child, or a substantial portion thereof, for the purpose of performing a procedure that the person performing such procedure knows will kill the unborn child and does kill the unborn child.'" 530 U. S., at 922 (quoting Neb. Rev. Stat. Ann. §28–326(9) (Supp. 1999)). The Court concluded that this statute encompassed D&E because "D&E will often involve a physician pulling a 'substantial portion' of a still living fetus, say, an arm or leg, into the vagina prior to the death of the fetus." 530 U. S., at 939. The Court also rejected the limiting interpretation urged by Nebraska's Attorney General that the statute's reference to a "procedure" that "'kill[s] the unborn child'" was to a distinct procedure, not to the abortion procedure as a whole. *Id.,* at 943.

Congress, it is apparent, responded to these concerns because the Act departs in material ways from the statute in *Stenberg*. It adopts the phrase "delivers a living fetus," §1531(b)(1)(A) (2000 ed., Supp. IV), instead of "'delivering . . . a living unborn child, or a substantial portion thereof,'" 530 U. S., at 938 (quoting Neb. Rev. Stat. Ann. §28–326(9) (Supp. 1999)). The Act's language, unlike the statute in *Stenberg*, expresses the usual meaning of "deliver" when used in connection with "fetus," namely, ex-

traction of an entire fetus rather than removal of fetal pieces. See Stedman's Medical Dictionary 470 (27th ed. 2000) (defining deliver as "[t]o assist a woman in childbirth" and "[t]o extract from an enclosed place, as the fetus from the womb, an object or foreign body"); see also I. Dox, B. Melloni, G. Eisner, & J. Melloni, The HarperCollins Illustrated Medical Dictionary 160 (4th ed. 2001); Merriam Webster's Collegiate Dictionary 306 (10th ed. 1997). The Act thus displaces the interpretation of "delivering" dictated by the Nebraska statute's reference to a "substantial portion" of the fetus. *Stenberg, supra*, at 944 (indicating that the Nebraska "statute itself specifies that it applies *both* to delivering 'an intact unborn child' *or* 'a substantial portion thereof'"). In interpreting statutory texts courts use the ordinary meaning of terms unless context requires a different result. See, *e.g.,* 2A N. Singer, Sutherland on Statutes and Statutory Construction §47:28 (rev. 6th ed. 2000). Here, unlike in *Stenberg*, the language does not require a departure from the ordinary meaning. D&E does not involve the delivery of a fetus because it requires the removal of fetal parts that are ripped from the fetus as they are pulled through the cervix.

The identification of specific anatomical landmarks to which the fetus must be partially delivered also differentiates the Act from the statute at issue in *Stenberg*. §1531(b)(1)(A) (2000 ed., Supp. IV). The Court in *Stenberg* interpreted "'substantial portion'" of the fetus to include an arm or a leg. 530 U. S., at 939. The Act's anatomical landmarks, by contrast, clarify that the removal of a small portion of the fetus is not prohibited. The landmarks also require the fetus to be delivered so that it is partially "outside the body of the mother." §1531(b)(1)(A). To come within the ambit of the Nebraska statute, on the other hand, a substantial portion of the fetus only had to be delivered into the vagina; no part of the fetus had to be outside the body of the mother before a doctor could face

criminal sanctions. *Id.,* at 938–939.

By adding an overt-act requirement Congress sought further to meet the Court's objections to the state statute considered in *Stenberg*. Compare 18 U. S. C. §1531(b)(1) (2000 ed., Supp. IV) with Neb. Rev. Stat. Ann. §28–326(9) (Supp. 1999). The Act makes the distinction the Nebraska statute failed to draw (but the Nebraska Attorney General advanced) by differentiating between the overall partial-birth abortion and the distinct overt act that kills the fetus. See *Stenberg*, 530 U. S., at 943–944. The fatal overt act must occur after delivery to an anatomical landmark, and it must be something "other than [the] completion of delivery." §1531(b)(1)(B). This distinction matters because, unlike intact D&E, standard D&E does not involve a delivery followed by a fatal act.

The canon of constitutional avoidance, finally, extinguishes any lingering doubt as to whether the Act covers the prototypical D&E procedure. "'[T]he elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.'" *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council*, 485 U. S. 568, 575 (1988) (quoting *Hooper* v. *California*, 155 U. S. 648, 657 (1895)). It is true this longstanding maxim of statutory interpretation has, in the past, fallen by the wayside when the Court confronted a statute regulating abortion. The Court at times employed an antagonistic "'canon of construction under which in cases involving abortion, a permissible reading of a statute [was] to be avoided at all costs.'" *Stenberg, supra*, at 977 (KENNEDY, J., dissenting) (quoting *Thornburgh*, 476 U. S., at 829 (O'Connor, J., dissenting)). *Casey* put this novel statutory approach to rest. *Stenberg, supra*, at 977 (KENNEDY, J., dissenting). *Stenberg* need not be interpreted to have revived it. We read that decision instead to stand for the uncontroversial proposition that the canon of constitutional avoidance does not apply

if a statute is not "genuinely susceptible to two construc-
tions." *Almendarez-Torres* v. *United States*, 523 U. S. 224,
238 (1998); see also *Clark* v. *Martinez*, 543 U. S. 371, 385
(2005). In *Stenberg* the Court found the statute covered
D&E. 530 U. S., at 938–945. Here, by contrast, interpret-
ing the Act so that it does not prohibit standard D&E is
the most reasonable reading and understanding of its
terms.

2

Contrary arguments by the respondents are unavailing.
Respondents look to situations that might arise during
D&E, situations not examined in *Stenberg*. They con-
tend—relying on the testimony of numerous abortion
doctors—that D&E may result in the delivery of a living
fetus beyond the Act's anatomical landmarks in a signifi-
cant fraction of cases. This is so, respondents say, because
doctors cannot predict the amount the cervix will dilate
before the abortion procedure. It might dilate to a degree
that the fetus will be removed largely intact. To complete
the abortion, doctors will commit an overt act that kills
the partially delivered fetus. Respondents thus posit that
any D&E has the potential to violate the Act, and that a
physician will not know beforehand whether the abortion
will proceed in a prohibited manner. Brief for Respondent
Planned Parenthood et al. in No. 05–1382, p. 38.

This reasoning, however, does not take account of the
Act's intent requirements, which preclude liability from
attaching to an accidental intact D&E. If a doctor's intent
at the outset is to perform a D&E in which the fetus would
not be delivered to either of the Act's anatomical land-
marks, but the fetus nonetheless is delivered past one of
those points, the requisite and prohibited scienter is not
present. 18 U. S. C. §1531(b)(1)(A) (2000 ed., Supp. IV).
When a doctor in that situation completes an abortion by
performing an intact D&E, the doctor does not violate the

Act. It is true that intent to cause a result may sometimes be inferred if a person "knows that that result is practically certain to follow from his conduct." 1 LaFave §5.2(a), at 341. Yet abortion doctors intending at the outset to perform a standard D&E procedure will not know that a prohibited abortion "is practically certain to follow from" their conduct. *Ibid.* A fetus is only delivered largely intact in a small fraction of the overall number of D&E abortions. *Planned Parenthood*, 320 F. Supp. 2d, at 965.

The evidence also supports a legislative determination that an intact delivery is almost always a conscious choice rather than a happenstance. Doctors, for example, may remove the fetus in a manner that will increase the chances of an intact delivery. See, *e.g.,* App. in No. 05–1382, at 74, 452. And intact D&E is usually described as involving some manner of serial dilation. See, *e.g.,* Dilation and Extraction 110. Doctors who do not seek to obtain this serial dilation perform an intact D&E on far fewer occasions. See, *e.g., Carhart*, 331 F. Supp. 2d, at 857–858 ("In order for intact removal to occur on a regular basis, Dr. Fitzhugh would have to dilate his patients with a second round of laminaria"). This evidence belies any claim that a standard D&E cannot be performed without intending or foreseeing an intact D&E.

Many doctors who testified on behalf of respondents, and who objected to the Act, do not perform an intact D&E by accident. On the contrary, they begin every D&E abortion with the objective of removing the fetus as intact as possible. See, *e.g., id.,* at 869 ("Since Dr. Chasen believes that the intact D & E is safer than the dismemberment D & E, Dr. Chasen's goal is to perform an intact D & E every time"); see also *id.,* at 873, 886. This does not prove, as respondents suggest, that every D&E might violate the Act and that the Act therefore imposes an undue burden. It demonstrates only that those doctors who intend to perform a D&E that would involve delivery of a living

fetus to one of the Act's anatomical landmarks must adjust their conduct to the law by not attempting to deliver the fetus to either of those points. Respondents have not shown that requiring doctors to intend dismemberment before delivery to an anatomical landmark will prohibit the vast majority of D&E abortions. The Act, then, cannot be held invalid on its face on these grounds.

## IV

Under the principles accepted as controlling here, the Act, as we have interpreted it, would be unconstitutional "if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." *Casey*, 505 U. S., at 878 (plurality opinion). The abortions affected by the Act's regulations take place both previability and postviability; so the quoted language and the undue burden analysis it relies upon are applicable. The question is whether the Act, measured by its text in this facial attack, imposes a substantial obstacle to late-term, but previability, abortions. The Act does not on its face impose a substantial obstacle, and we reject this further facial challenge to its validity.

## A

The Act's purposes are set forth in recitals preceding its operative provisions. A description of the prohibited abortion procedure demonstrates the rationale for the congressional enactment. The Act proscribes a method of abortion in which a fetus is killed just inches before completion of the birth process. Congress stated as follows: "Implicitly approving such a brutal and inhumane procedure by choosing not to prohibit it will further coarsen society to the humanity of not only newborns, but all vulnerable and innocent human life, making it increasingly difficult to protect such life." Congressional Findings (14)(N), in notes following 18 U. S. C. §1531 (2000 ed., Supp. IV), p.

769. The Act expresses respect for the dignity of human life.

Congress was concerned, furthermore, with the effects on the medical community and on its reputation caused by the practice of partial-birth abortion. The findings in the Act explain:

> "Partial-birth abortion . . . confuses the medical, legal, and ethical duties of physicians to preserve and promote life, as the physician acts directly against the physical life of a child, whom he or she had just delivered, all but the head, out of the womb, in order to end that life." Congressional Findings (14)(J), *ibid.*

There can be no doubt the government "has an interest in protecting the integrity and ethics of the medical profession." *Washington* v. *Glucksberg*, 521 U. S. 702, 731 (1997); see also *Barsky* v. *Board of Regents of Univ. of N. Y.*, 347 U. S. 442, 451 (1954) (indicating the State has "legitimate concern for maintaining high standards of professional conduct" in the practice of medicine). Under our precedents it is clear the State has a significant role to play in regulating the medical profession.

*Casey* reaffirmed these governmental objectives. The government may use its voice and its regulatory authority to show its profound respect for the life within the woman. A central premise of the opinion was that the Court's precedents after *Roe* had "undervalue[d] the State's interest in potential life." 505 U. S., at 873 (plurality opinion); see also *id.,* at 871. The plurality opinion indicated "[t]he fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it." *Id.,* at 874. This was not an idle assertion. The three premises of *Casey* must coexist. See *id.,* at 846 (opinion of the Court). The third premise, that the State, from the

inception of the pregnancy, maintains its own regulatory interest in protecting the life of the fetus that may become a child, cannot be set at naught by interpreting *Casey*'s requirement of a health exception so it becomes tantamount to allowing a doctor to choose the abortion method he or she might prefer. Where it has a rational basis to act, and it does not impose an undue burden, the State may use its regulatory power to bar certain procedures and substitute others, all in furtherance of its legitimate interests in regulating the medical profession in order to promote respect for life, including life of the unborn.

The Act's ban on abortions that involve partial delivery of a living fetus furthers the Government's objectives. No one would dispute that, for many, D&E is a procedure itself laden with the power to devalue human life. Congress could nonetheless conclude that the type of abortion proscribed by the Act requires specific regulation because it implicates additional ethical and moral concerns that justify a special prohibition. Congress determined that the abortion methods it proscribed had a "disturbing similarity to the killing of a newborn infant," Congressional Findings (14)(L), in notes following 18 U. S. C. §1531 (2000 ed., Supp. IV), p. 769, and thus it was concerned with "draw[ing] a bright line that clearly distinguishes abortion and infanticide." Congressional Findings (14)(G), *ibid.* The Court has in the past confirmed the validity of drawing boundaries to prevent certain practices that extinguish life and are close to actions that are condemned. *Glucksberg* found reasonable the State's "fear that permitting assisted suicide will start it down the path to voluntary and perhaps even involuntary euthanasia." 521 U. S., at 732–735, and n. 23.

Respect for human life finds an ultimate expression in the bond of love the mother has for her child. The Act recognizes this reality as well. Whether to have an abortion requires a difficult and painful moral decision. *Casey,*

*supra*, at 852–853 (opinion of the Court). While we find no reliable data to measure the phenomenon, it seems unexceptionable to conclude some women come to regret their choice to abort the infant life they once created and sustained. See Brief for Sandra Cano et al. as *Amici Curiae* in No. 05–380, pp. 22–24. Severe depression and loss of esteem can follow. See *ibid.*

In a decision so fraught with emotional consequence some doctors may prefer not to disclose precise details of the means that will be used, confining themselves to the required statement of risks the procedure entails. From one standpoint this ought not to be surprising. Any number of patients facing imminent surgical procedures would prefer not to hear all details, lest the usual anxiety preceding invasive medical procedures become the more intense. This is likely the case with the abortion procedures here in issue. See, *e.g., Nat. Abortion Federation*, 330 F. Supp. 2d, at 466, n. 22 ("Most of [the plaintiffs'] experts acknowledged that they do not describe to their patients what [the D&E and intact D&E] procedures entail in clear and precise terms"); see also *id.,* at 479.

It is, however, precisely this lack of information concerning the way in which the fetus will be killed that is of legitimate concern to the State. *Casey, supra*, at 873 (plurality opinion) ("States are free to enact laws to provide a reasonable framework for a woman to make a decision that has such profound and lasting meaning"). The State has an interest in ensuring so grave a choice is well informed. It is self-evident that a mother who comes to regret her choice to abort must struggle with grief more anguished and sorrow more profound when she learns, only after the event, what she once did not know: that she allowed a doctor to pierce the skull and vacuum the fast-developing brain of her unborn child, a child assuming the human form.

It is a reasonable inference that a necessary effect of the

regulation and the knowledge it conveys will be to encour-
age some women to carry the infant to full term, thus
reducing the absolute number of late-term abortions. The
medical profession, furthermore, may find different and
less shocking methods to abort the fetus in the second
trimester, thereby accommodating legislative demand.
The State's interest in respect for life is advanced by the
dialogue that better informs the political and legal sys-
tems, the medical profession, expectant mothers, and
society as a whole of the consequences that follow from a
decision to elect a late-term abortion.

It is objected that the standard D&E is in some respects
as brutal, if not more, than the intact D&E, so that the
legislation accomplishes little. What we have already
said, however, shows ample justification for the regula-
tion. Partial-birth abortion, as defined by the Act, differs
from a standard D&E because the former occurs when the
fetus is partially outside the mother to the point of one of
the Act's anatomical landmarks. It was reasonable for
Congress to think that partial-birth abortion, more than
standard D&E, "undermines the public's perception of the
appropriate role of a physician during the delivery process,
and perverts a process during which life is brought into
the world." Congressional Findings (14)(K), in notes
following 18 U. S. C. §1531 (2000 ed., Supp. IV), p. 769.
There would be a flaw in this Court's logic, and an irony in
its jurisprudence, were we first to conclude a ban on both
D&E and intact D&E was overbroad and then to say it is
irrational to ban only intact D&E because that does not
proscribe both procedures. In sum, we reject the conten-
tion that the congressional purpose of the Act was "to
place a substantial obstacle in the path of a woman seek-
ing an abortion." 505 U. S., at 878 (plurality opinion).

### B

The Act's furtherance of legitimate government inter-

ests bears upon, but does not resolve, the next question: whether the Act has the effect of imposing an unconstitutional burden on the abortion right because it does not allow use of the barred procedure where "'necessary, in appropriate medical judgment, for [the] preservation of the . . . health of the mother.'" *Ayotte*, 546 U. S., at 327–328 (quoting *Casey, supra*, at 879 (plurality opinion)). The prohibition in the Act would be unconstitutional, under precedents we here assume to be controlling, if it "subject[ed] [women] to significant health risks." *Ayotte, supra*, at 328; see also *Casey, supra*, at 880 (opinion of the Court). In *Ayotte* the parties agreed a health exception to the challenged parental-involvement statute was necessary "to avert serious and often irreversible damage to [a pregnant minor's] health." 546 U. S., at 328. Here, by contrast, whether the Act creates significant health risks for women has been a contested factual question. The evidence presented in the trial courts and before Congress demonstrates both sides have medical support for their position.

Respondents presented evidence that intact D&E may be the safest method of abortion, for reasons similar to those adduced in *Stenberg*. See 530 U. S., at 932. Abortion doctors testified, for example, that intact D&E decreases the risk of cervical laceration or uterine perforation because it requires fewer passes into the uterus with surgical instruments and does not require the removal of bony fragments of the dismembered fetus, fragments that may be sharp. Respondents also presented evidence that intact D&E was safer both because it reduces the risks that fetal parts will remain in the uterus and because it takes less time to complete. Respondents, in addition, proffered evidence that intact D&E was safer for women with certain medical conditions or women with fetuses that had certain anomalies. See, *e.g., Carhart*, 331 F. Supp. 2d, at 923–929; *Nat. Abortion Federation, supra*,

at 470–474; *Planned Parenthood*, 320 F. Supp. 2d, at 982–983.

These contentions were contradicted by other doctors who testified in the District Courts and before Congress. They concluded that the alleged health advantages were based on speculation without scientific studies to support them. They considered D&E always to be a safe alternative. See, *e.g., Carhart, supra*, at 930–940; *Nat. Abortion Federation*, 330 F. Supp. 2d, at 470–474; *Planned Parenthood*, 320 F. Supp. 2d, at 983.

There is documented medical disagreement whether the Act's prohibition would ever impose significant health risks on women. See, *e.g., id.,* at 1033 ("[T]here continues to be a division of opinion among highly qualified experts regarding the necessity or safety of intact D & E"); see also *Nat. Abortion Federation, supra*, at 482. The three District Courts that considered the Act's constitutionality appeared to be in some disagreement on this central factual question. The District Court for the District of Nebraska concluded "the banned procedure is, sometimes, the safest abortion procedure to preserve the health of women." *Carhart, supra*, at 1017. The District Court for the Northern District of California reached a similar conclusion. *Planned Parenthood, supra*, at 1002 (finding intact D&E was "under certain circumstances . . . significantly safer than D & E by disarticulation"). The District Court for the Southern District of New York was more skeptical of the purported health benefits of intact D&E. It found the Attorney General's "expert witnesses reasonably and effectively refuted [the plaintiffs'] proffered bases for the opinion that [intact D&E] has safety advantages over other second-trimester abortion procedures." *Nat. Abortion Federation*, 330 F. Supp. 2d, at 479. In addition it did "not believe that many of [the plaintiffs'] purported reasons for why [intact D&E] is medically necessary [were] credible; rather [it found them to be] theo-

retical or false." *Id.,* at 480. The court nonetheless invalidated the Act because it determined "a significant body of medical opinion . . . holds that D & E has safety advantages over induction and that [intact D&E] has some safety advantages (however hypothetical and unsubstantiated by scientific evidence) over D & E for some women in some circumstances." *Ibid.*

The question becomes whether the Act can stand when this medical uncertainty persists. The Court's precedents instruct that the Act can survive this facial attack. The Court has given state and federal legislatures wide discretion to pass legislation in areas where there is medical and scientific uncertainty. See *Kansas* v. *Hendricks*, 521 U. S. 346, 360, n. 3 (1997); *Jones* v. *United States*, 463 U. S. 354, 364–365, n. 13, 370 (1983); *Lambert* v. *Yellowley*, 272 U. S. 581, 597 (1926); *Collins* v. *Texas*, 223 U. S. 288, 297–298 (1912); *Jacobson* v. *Massachusetts*, 197 U. S. 11, 30–31 (1905); see also *Stenberg, supra*, at 969–972 (KENNEDY, J., dissenting); *Marshall* v. *United States*, 414 U. S. 417, 427 (1974) ("When Congress undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad").

This traditional rule is consistent with *Casey*, which confirms the State's interest in promoting respect for human life at all stages in the pregnancy. Physicians are not entitled to ignore regulations that direct them to use reasonable alternative procedures. The law need not give abortion doctors unfettered choice in the course of their medical practice, nor should it elevate their status above other physicians in the medical community. In *Casey* the controlling opinion held an informed-consent requirement in the abortion context was "no different from a requirement that a doctor give certain specific information about any medical procedure." 505 U. S., at 884 (joint opinion). The opinion stated "the doctor-patient relation here is entitled to the same solicitude it receives in other con-

texts." *Ibid.;* see also *Webster* v. *Reproductive Health
Services*, 492 U. S. 490, 518–519 (1989) (plurality opinion)
(criticizing *Roe*'s trimester framework because, *inter alia,*
it "left this Court to serve as the country's *ex officio* medi-
cal board with powers to approve or disapprove medical
and operative practices and standards throughout the
United States" (internal quotation marks omitted));
*Mazurek* v. *Armstrong*, 520 U. S. 968, 973 (1997) *(per
curiam)* (upholding a restriction on the performance of
abortions to licensed physicians despite the respondents'
contention "all health evidence contradicts the claim that
there is any health basis for the law" (internal quotation
marks omitted)).

Medical uncertainty does not foreclose the exercise of
legislative power in the abortion context any more than it
does in other contexts. See *Hendricks, supra*, at 360, n. 3.
The medical uncertainty over whether the Act's prohibi-
tion creates significant health risks provides a sufficient
basis to conclude in this facial attack that the Act does not
impose an undue burden.

The conclusion that the Act does not impose an undue
burden is supported by other considerations. Alternatives
are available to the prohibited procedure. As we have
noted, the Act does not proscribe D&E. One District Court
found D&E to have extremely low rates of medical compli-
cations. *Planned Parenthood, supra*, at 1000. Another
indicated D&E was "generally the safest method of abor-
tion during the second trimester." *Carhart*, 331 F. Supp.
2d, at 1031; see also *Nat. Abortion Federation, supra*, at
467–468 (explaining that "[e]xperts testifying for both
sides" agreed D&E was safe). In addition the Act's prohi-
bition only applies to the delivery of "a living fetus." 18
U. S. C. §1531(b)(1)(A) (2000 ed., Supp. IV). If the intact
D&E procedure is truly necessary in some circumstances,
it appears likely an injection that kills the fetus is an
alternative under the Act that allows the doctor to perform

the procedure.

The instant cases, then, are different from *Planned Parenthood of Central Mo.* v. *Danforth*, 428 U. S. 52, 77–79 (1976), in which the Court invalidated a ban on saline amniocentesis, the then-dominant second-trimester abortion method. The Court found the ban in *Danforth* to be "an unreasonable or arbitrary regulation designed to inhibit, and having the effect of inhibiting, the vast majority of abortions after the first 12 weeks." *Id.,* at 79. Here the Act allows, among other means, a commonly used and generally accepted method, so it does not construct a substantial obstacle to the abortion right.

In reaching the conclusion the Act does not require a health exception we reject certain arguments made by the parties on both sides of these cases. On the one hand, the Attorney General urges us to uphold the Act on the basis of the congressional findings alone. Brief for Petitioner in No. 05–380, at 23. Although we review congressional factfinding under a deferential standard, we do not in the circumstances here place dispositive weight on Congress' findings. The Court retains an independent constitutional duty to review factual findings where constitutional rights are at stake. See *Crowell* v. *Benson*, 285 U. S. 22, 60 (1932) ("In cases brought to enforce constitutional rights, the judicial power of the United States necessarily extends to the independent determination of all questions, both of fact and law, necessary to the performance of that supreme function").

As respondents have noted, and the District Courts recognized, some recitations in the Act are factually incorrect. See *Nat. Abortion Federation*, 330 F. Supp. 2d, at 482, 488–491. Whether or not accurate at the time, some of the important findings have been superseded. Two examples suffice. Congress determined no medical schools provide instruction on the prohibited procedure. Congressional Findings (14)(B), in notes following 18 U. S. C.

§1531 (2000 ed., Supp. IV), p. 769. The testimony in the District Courts, however, demonstrated intact D&E is taught at medical schools. *Nat. Abortion Federation, supra*, at 490; *Planned Parenthood*, 320 F. Supp. 2d, at 1029. Congress also found there existed a medical consensus that the prohibited procedure is never medically necessary. Congressional Findings (1), in notes following 18 U. S. C. §1531 (2000 ed., Supp. IV), p. 767. The evidence presented in the District Courts contradicts that conclusion. See, *e.g., Carhart, supra*, at 1012–1015; *Nat. Abortion Federation, supra*, at 488–489; *Planned Parenthood, supra*, at 1025–1026. Uncritical deference to Congress' factual findings in these cases is inappropriate.

On the other hand, relying on the Court's opinion in *Stenberg*, respondents contend that an abortion regulation must contain a health exception "if 'substantial medical authority supports the proposition that banning a particular procedure could endanger women's health.'" Brief for Respondents in No. 05–380, p. 19 (quoting 530 U. S., at 938); see also Brief for Respondent Planned Parenthood et al. in No. 05–1382, at 12 (same). As illustrated by respondents' arguments and the decisions of the Courts of Appeals, *Stenberg* has been interpreted to leave no margin of error for legislatures to act in the face of medical uncertainty. *Carhart*, 413 F. 3d, at 796; *Planned Parenthood*, 435 F. 3d, at 1173; see also *Nat. Abortion Federation*, 437 F. 3d, at 296 (Walker, C. J., concurring) (explaining the standard under *Stenberg* "is a virtually insurmountable evidentiary hurdle").

A zero tolerance policy would strike down legitimate abortion regulations, like the present one, if some part of the medical community were disinclined to follow the proscription. This is too exacting a standard to impose on the legislative power, exercised in this instance under the Commerce Clause, to regulate the medical profession. Considerations of marginal safety, including the balance of

risks, are within the legislative competence when the regulation is rational and in pursuit of legitimate ends. When standard medical options are available, mere convenience does not suffice to displace them; and if some procedures have different risks than others, it does not follow that the State is altogether barred from imposing reasonable regulations. The Act is not invalid on its face where there is uncertainty over whether the barred procedure is ever necessary to preserve a woman's health, given the availability of other abortion procedures that are considered to be safe alternatives.

V

The considerations we have discussed support our further determination that these facial attacks should not have been entertained in the first instance. In these circumstances the proper means to consider exceptions is by as-applied challenge. The Government has acknowledged that preenforcement, as-applied challenges to the Act can be maintained. Tr. of Oral Arg. in No. 05–380, pp. 21–23. This is the proper manner to protect the health of the woman if it can be shown that in discrete and well-defined instances a particular condition has or is likely to occur in which the procedure prohibited by the Act must be used. In an as-applied challenge the nature of the medical risk can be better quantified and balanced than in a facial attack.

The latitude given facial challenges in the First Amendment context is inapplicable here. Broad challenges of this type impose "a heavy burden" upon the parties maintaining the suit. *Rust* v. *Sullivan*, 500 U. S. 173, 183 (1991). What that burden consists of in the specific context of abortion statutes has been a subject of some question. Compare *Ohio* v. *Akron Center for Reproductive Health*, 497 U. S. 502, 514 (1990) ("[B]ecause appellees are making a facial challenge to a statute, they

must show that no set of circumstances exists under which the Act would be valid" (internal quotation marks omitted)), with *Casey*, 505 U. S., at 895 (opinion of the Court) (indicating a spousal-notification statute would impose an undue burden "in a large fraction of the cases in which [it] is relevant" and holding the statutory provision facially invalid). See also *Janklow* v. *Planned Parenthood, Sioux Falls Clinic*, 517 U. S. 1174 (1996). We need not resolve that debate.

As the previous sections of this opinion explain, respondents have not demonstrated that the Act would be unconstitutional in a large fraction of relevant cases. *Casey, supra*, at 895 (opinion of the Court). We note that the statute here applies to all instances in which the doctor proposes to use the prohibited procedure, not merely those in which the woman suffers from medical complications. It is neither our obligation nor within our traditional institutional role to resolve questions of constitutionality with respect to each potential situation that might develop. "[I]t would indeed be undesirable for this Court to consider every conceivable situation which might possibly arise in the application of complex and comprehensive legislation." *United States* v. *Raines*, 362 U. S. 17, 21 (1960) (internal quotation marks omitted). For this reason, "[a]s-applied challenges are the basic building blocks of constitutional adjudication." Fallon, As-Applied and Facial Challenges and Third-Party Standing, 113 Harv. L. Rev. 1321, 1328 (2000).

The Act is open to a proper as-applied challenge in a discrete case. Cf. *Wisconsin Right to Life, Inc.* v. *Federal Election Comm'n*, 546 U. S. 410, 411–412 (2006) *(per curiam)*. No as-applied challenge need be brought if the prohibition in the Act threatens a woman's life because the Act already contains a life exception. 18 U. S. C. §1531(a) (2000 ed., Supp. IV).

Opinion of the Court

\*          \*          \*

Respondents have not demonstrated that the Act, as a facial matter, is void for vagueness, or that it imposes an undue burden on a woman's right to abortion based on its overbreadth or lack of a health exception.  For these reasons the judgments of the Courts of Appeals for the Eighth and Ninth Circuits are reversed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

Nos. 05–380 and 05–1382

———————

ALBERTO R. GONZALES, ATTORNEY GENERAL,
PETITIONER
05–380　　　　　　　　*v.*
LEROY CARHART ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE EIGHTH CIRCUIT


ALBERTO R. GONZALES, ATTORNEY GENERAL,
PETITIONER
05–1382　　　　　　　　*v.*
PLANNED PARENTHOOD FEDERATION OF
AMERICA, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[April 18, 2007]

JUSTICE THOMAS, with whom JUSTICE SCALIA joins, concurring.

I join the Court's opinion because it accurately applies current jurisprudence, including *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833 (1992). I write separately to reiterate my view that the Court's abortion jurisprudence, including *Casey* and *Roe* v. *Wade*, 410 U. S. 113 (1973), has no basis in the Constitution. See *Casey*, *supra*, at 979 (SCALIA, J., concurring in judgment in part and dissenting in part); *Stenberg* v. *Carhart*, 530 U. S. 914, 980–983 (2000) (THOMAS, J., dissenting). I also note that whether the Act constitutes a permissible exercise of Congress' power under the Commerce Clause is not before the Court. The parties did not raise or brief that issue; it

is outside the question presented; and the lower courts did not address it. See *Cutter* v. *Wilkinson*, 544 U. S. 709, 727, n. 2 (2005) (THOMAS, J., concurring).

# SUPREME COURT OF THE UNITED STATES

———————

Nos. 05–380 and 05–1382

———————

ALBERTO R. GONZALES, ATTORNEY GENERAL,
PETITIONER

05–380                      *v.*

LEROY CARHART ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE EIGHTH CIRCUIT

ALBERTO R. GONZALES, ATTORNEY GENERAL,
PETITIONER

05–1382                      *v.*

PLANNED PARENTHOOD FEDERATION OF
AMERICA, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[April 18, 2007]

JUSTICE GINSBURG, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE BREYER join, dissenting.

In *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833, 844 (1992), the Court declared that "[l]iberty finds no refuge in a jurisprudence of doubt." There was, the Court said, an "imperative" need to dispel doubt as to "the meaning and reach" of the Court's 7-to-2 judgment, rendered nearly two decades earlier in *Roe* v. *Wade*, 410 U. S. 113 (1973). 505 U. S., at 845. Responsive to that need, the Court endeavored to provide secure guidance to "[s]tate and federal courts as well as legislatures throughout the Union," by defining "the rights of the woman and the legitimate authority of the State respecting the termination of pregnancies by abortion proce-

dures." *Ibid.*

Taking care to speak plainly, the *Casey* Court restated and reaffirmed *Roe*'s essential holding. 505 U. S., at 845–846. First, the Court addressed the type of abortion regulation permissible prior to fetal viability. It recognized "the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State." *Id.*, at 846. Second, the Court acknowledged "the State's power to restrict abortions *after fetal viability*, if the law contains exceptions for pregnancies which endanger the woman's life *or health*." *Ibid.* (emphasis added). Third, the Court confirmed that "the State has legitimate interests from the outset of the pregnancy in protecting *the health of the woman* and the life of the fetus that may become a child." *Ibid.* (emphasis added).

In reaffirming *Roe*, the *Casey* Court described the centrality of "the decision whether to bear . . . a child," *Eisenstadt* v. *Baird*, 405 U. S. 438, 453 (1972), to a woman's "dignity and autonomy," her "personhood" and "destiny," her "conception of . . . her place in society." 505 U. S., at 851–852. Of signal importance here, the *Casey* Court stated with unmistakable clarity that state regulation of access to abortion procedures, even after viability, must protect "the health of the woman." *Id.,* at 846.

Seven years ago, in *Stenberg* v. *Carhart*, 530 U. S. 914 (2000), the Court invalidated a Nebraska statute criminalizing the performance of a medical procedure that, in the political arena, has been dubbed "partial-birth abortion."[1]

--------

[1] The term "partial-birth abortion" is neither recognized in the medical literature nor used by physicians who perform second-trimester abortions. See *Planned Parenthood Federation of Am.* v. *Ashcroft*, 320 F. Supp. 2d 957, 964 (ND Cal. 2004), aff'd, 435 F. 3d 1163 (CA9 2006). The medical community refers to the procedure as either dilation & extraction (D&X) or intact dilation and evacuation (intact D&E). See, *e.g.*, *ante*, at 5; *Stenberg* v. *Carhart*, 530 U. S. 914, 927 (2000).

With fidelity to the *Roe-Casey* line of precedent, the Court held the Nebraska statute unconstitutional in part because it lacked the requisite protection for the preservation of a woman's health. *Stenberg*, 530 U. S., at 930; cf. *Ayotte* v. *Planned Parenthood of Northern New Eng.*, 546 U. S. 320, 327 (2006).

Today's decision is alarming. It refuses to take *Casey* and *Stenberg* seriously. It tolerates, indeed applauds, federal intervention to ban nationwide a procedure found necessary and proper in certain cases by the American College of Obstetricians and Gynecologists (ACOG). It blurs the line, firmly drawn in *Casey*, between previability and postviability abortions. And, for the first time since *Roe*, the Court blesses a prohibition with no exception safeguarding a woman's health.

I dissent from the Court's disposition. Retreating from prior rulings that abortion restrictions cannot be imposed absent an exception safeguarding a woman's health, the Court upholds an Act that surely would not survive under the close scrutiny that previously attended state-decreed limitations on a woman's reproductive choices.

## I

### A

As *Casey* comprehended, at stake in cases challenging abortion restrictions is a woman's "control over her [own] destiny." 505 U. S., at 869 (plurality opinion). See also *id.*, at 852 (majority opinion).[2] "There was a time, not so long ago," when women were "regarded as the center of home and family life, with attendant special responsibili-

---

[2]*Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833, 851–852 (1992), described more precisely than did *Roe* v. *Wade*, 410 U. S. 113 (1973), the impact of abortion restrictions on women's liberty. *Roe*'s focus was in considerable measure on "vindicat[ing] the right of the physician to administer medical treatment according to his professional judgment." *Id.*, at 165.

ties that precluded full and independent legal status under the Constitution." *Id.*, at 896–897 (quoting *Hoyt* v. *Florida*, 368 U. S. 57, 62 (1961)). Those views, this Court made clear in *Casey*, "are no longer consistent with our understanding of the family, the individual, or the Constitution." 505 U. S., at 897. Women, it is now acknowledged, have the talent, capacity, and right "to participate equally in the economic and social life of the Nation." *Id.*, at 856. Their ability to realize their full potential, the Court recognized, is intimately connected to "their ability to control their reproductive lives." *Ibid.* Thus, legal challenges to undue restrictions on abortion procedures do not seek to vindicate some generalized notion of privacy; rather, they center on a woman's autonomy to determine her life's course, and thus to enjoy equal citizenship stature. See, *e.g.*, Siegel, Reasoning from the Body: A Historical Perspective on Abortion Regulation and Questions of Equal Protection, 44 Stan. L. Rev. 261 (1992); Law, Rethinking Sex and the Constitution, 132 U. Pa. L. Rev. 955, 1002–1028 (1984).

In keeping with this comprehension of the right to reproductive choice, the Court has consistently required that laws regulating abortion, at any stage of pregnancy and in all cases, safeguard a woman's health. See, *e.g.*, *Ayotte*, 546 U. S., at 327–328 ("[O]ur precedents hold . . . that a State may not restrict access to abortions that are necessary, in appropriate medical judgment, for preservation of the life or health of the [woman]." (quoting *Casey*, 505 U. S., at 879 (plurality opinion))); *Stenberg*, 530 U. S., at 930 ("Since the law requires a health exception in order to validate even a postviability abortion regulation, it at a minimum requires the same in respect to previability regulation."). See also *Thornburgh* v. *American College of Obstetricians and Gynecologists*, 476 U. S. 747, 768–769 (1986) (invalidating a *post*-viability abortion regulation for "fail[ure] to require that [a pregnant woman's] health be

the physician's paramount consideration").

We have thus ruled that a State must avoid subjecting women to health risks not only where the pregnancy itself creates danger, but also where state regulation forces women to resort to less safe methods of abortion. See *Planned Parenthood of Central Mo.* v. *Danforth*, 428 U. S. 52, 79 (1976) (holding unconstitutional a ban on a method of abortion that "force[d] a woman . . . to terminate her pregnancy by methods more dangerous to her health"). See also *Stenberg*, 530 U. S., at 931 ("[Our cases] make clear that a risk to . . . women's health is the same whether it happens to arise from regulating a particular method of abortion, or from barring abortion entirely."). Indeed, we have applied the rule that abortion regulation must safeguard a woman's health to the particular procedure at issue here—intact dilation and evacuation (D&E).[3]

––––––––––

[3] Dilation and evacuation (D&E) is the most frequently used abortion procedure during the second trimester of pregnancy; intact D&E is a variant of the D&E procedure. See *ante*, at 4, 6; *Stenberg*, 530 U. S., at 924, 927; *Planned Parenthood*, 320 F. Supp. 2d, at 966. Second-trimester abortions (*i.e.*, midpregnancy, previability abortions) are, however, relatively uncommon. Between 85 and 90 percent of all abortions performed in the United States take place during the first three months of pregnancy. See *ante*, at 3. See also *Stenberg*, 530 U. S., at 923–927; *National Abortion Federation* v. *Ashcroft*, 330 F. Supp. 2d 436, 464 (SDNY 2004), aff'd *sub nom. National Abortion Federation* v. *Gonzales*, 437 F. 3d 278 (CA2 2006); *Planned Parenthood*, 320 F. Supp. 2d, at 960, and n. 4.

Adolescents and indigent women, research suggests, are more likely than other women to have difficulty obtaining an abortion during the first trimester of pregnancy. Minors may be unaware they are pregnant until relatively late in pregnancy, while poor women's financial constraints are an obstacle to timely receipt of services. See Finer, Frohwirth, Dauphinee, Singh, & Moore, Timing of Steps and Reasons for Delays in Obtaining Abortions in the United States, 74 Contraception 334, 341–343 (2006). See also Drey et al., Risk Factors Associated with Presenting for Abortion in the Second Trimester, 107 Obstetrics & Gynecology 128, 133 (Jan. 2006) (concluding that women who have second-trimester abortions typically discover relatively late that they

In *Stenberg*, we expressly held that a statute banning intact D&E was unconstitutional in part because it lacked a health exception.  530 U. S., at 930, 937.  We noted that there existed a "division of medical opinion" about the relative safety of intact D&E, *id.*, at 937, but we made clear that as long as "substantial medical authority supports the proposition that banning a particular abortion procedure could endanger women's health," a health exception is required, *id.*, at 938.  We explained:

> "The word 'necessary' in *Casey*'s phrase 'necessary, in appropriate medical judgment, for the preservation of the life or health of the [pregnant woman],' cannot refer to an absolute necessity or to absolute proof. Medical treatments and procedures are often considered appropriate (or inappropriate) in light of estimated comparative health risks (and health benefits) in particular cases.  Neither can that phrase require unanimity of medical opinion.  Doctors often differ in their estimation of comparative health risks and appropriate treatment.  And *Casey*'s words 'appropriate medical judgment' must embody the judicial need to tolerate responsible differences of medical opinion . . . ."  *Id.*, at 937 (citation omitted).

Thus, we reasoned, division in medical opinion "at most means uncertainty, a factor that signals the presence of

_____

are pregnant).  Severe fetal anomalies and health problems confronting the pregnant woman are also causes of second-trimester abortions; many such conditions cannot be diagnosed or do not develop until the second trimester.  See, *e.g.*, Finer, *supra*, at 344; F. Cunningham et al., Williams Obstetrics 242, 290, 328–329, (22d ed. 2005); cf. Schechtman, Gray, Baty, & Rothman, Decision-Making for Termination of Pregnancies with Fetal Anomalies: Analysis of 53,000 Pregnancies, 99 Obstetrics & Gynecology 216, 220–221 (Feb. 2002) (nearly all women carrying fetuses with the most serious central nervous system anomalies chose to abort their pregnancies).

risk, not its absence." *Ibid.* "[A] statute that altogether forbids [intact D&E] . . . . consequently must contain a health exception." *Id.*, at 938. See also *id.*, at 948 (O'Connor, J., concurring) ("Th[e] lack of a health exception necessarily renders the statute unconstitutional.").

## B

In 2003, a few years after our ruling in *Stenberg*, Congress passed the Partial-Birth Abortion Ban Act—without an exception for women's health. See 18 U. S. C. §1531(a) (2000 ed., Supp. IV).[4] The congressional findings on which the Partial-Birth Abortion Ban Act rests do not withstand inspection, as the lower courts have determined and this Court is obliged to concede. *Ante*, at 35–36. See *National Abortion Federation* v. *Ashcroft*, 330 F. Supp. 2d 436, 482 (SDNY 2004) ("Congress did not . . . carefully consider the evidence before arriving at its findings."), aff'd *sub nom. National Abortion Federation* v. *Gonzales*, 437 F. 3d 278 (CA2 2006). See also *Planned Parenthood Federation of Am.* v. *Ashcroft*, 320 F. Supp. 2d 957, 1019 (ND Cal. 2004) ("[N]one of the six physicians who testified before Congress had ever performed an intact D&E. Several did not provide abortion services at all; and one was not even an obgyn. . . . [T]he oral testimony before Congress was not only unbalanced, but intentionally polemic."), aff'd, 435 F. 3d 1163 (CA9 2006); *Carhart* v. *Ashcroft*, 331 F. Supp. 2d 805, 1011 (Neb. 2004) ("Congress arbitrarily relied upon the opinions of doctors who claimed to have no (or very little) recent and relevant experience with surgical

---

[4] The Act's sponsors left no doubt that their intention was to nullify our ruling in *Stenberg*, 530 U. S. 914. See, *e.g.*, 149 Cong. Rec. 5731 (2003) (statement of Sen. Santorum) ("Why are we here? We are here because the Supreme Court defended the indefensible. . . . We have responded to the Supreme Court."). See also 148 Cong. Rec. 14273 (2002) (statement of Rep. Linder) (rejecting proposition that Congress has "no right to legislate a ban on this horrible practice because the Supreme Court says [it] cannot").

abortions, and disregarded the views of doctors who had significant and relevant experience with those procedures."), aff'd, 413 F. 3d 791 (CA8 2005).

Many of the Act's recitations are incorrect. See *ante*, at 35–36. For example, Congress determined that no medical schools provide instruction on intact D&E. §2(14)(B), 117 Stat. 1204, notes following 18 U. S. C. §1531 (2000 ed., Supp. IV), p. 769, ¶(14)(B) (Congressional Findings). But in fact, numerous leading medical schools teach the procedure. See *Planned Parenthood*, 320 F. Supp. 2d, at 1029; *National Abortion Federation*, 330 F. Supp. 2d, at 479. See also Brief for ACOG as *Amicus Curiae* 18 ("Among the schools that now teach the intact variant are Columbia, Cornell, Yale, New York University, Northwestern, University of Pittsburgh, University of Pennsylvania, University of Rochester, and University of Chicago.").

More important, Congress claimed there was a medical consensus that the banned procedure is never necessary. Congressional Findings (1), in notes following 18 U. S. C. §1531 (2000 ed., Supp. IV), p. 767. But the evidence "very clearly demonstrate[d] the opposite." *Planned Parenthood*, 320 F. Supp. 2d, at 1025. See also *Carhart*, 331 F. Supp. 2d, at 1008–1009 ("[T]here was no evident consensus in the record that Congress compiled. There was, however, a substantial body of medical opinion presented to Congress in opposition. If anything . . . the congressional record establishes that there was a 'consensus' in favor of the banned procedure."); *National Abortion Federation*, 330 F. Supp. 2d, at 488 ("The congressional record itself undermines [Congress'] finding" that there is a medical consensus that intact D&E "is never medically necessary and should be prohibited." (internal quotation marks omitted)).

Similarly, Congress found that "[t]here is no credible medical evidence that partial-birth abortions are safe or are safer than other abortion procedures." Congressional

Findings (14)(B), in notes following 18 U. S. C. §1531 (2000 ed., Supp. IV), p. 769. But the congressional record includes letters from numerous individual physicians stating that pregnant women's health would be jeopardized under the Act, as well as statements from nine professional associations, including ACOG, the American Public Health Association, and the California Medical Association, attesting that intact D&E carries meaningful safety advantages over other methods. See *National Abortion Federation*, 330 F. Supp. 2d, at 490. See also *Planned Parenthood*, 320 F. Supp. 2d, at 1021 ("Congress in its findings . . . chose to disregard the statements by ACOG and other medical organizations."). No comparable medical groups supported the ban. In fact, "all of the government's own witnesses disagreed with many of the specific congressional findings." *Id.,* at 1024.

C

In contrast to Congress, the District Courts made findings after full trials at which all parties had the opportunity to present their best evidence. The courts had the benefit of "much more extensive medical and scientific evidence . . . concerning the safety and necessity of intact D&Es." *Planned Parenthood*, 320 F. Supp. 2d, at 1014; cf. *National Abortion Federation*, 330 F. Supp. 2d, at 482 (District Court "heard more evidence during its trial than Congress heard over the span of eight years.").

During the District Court trials, "numerous" "extraordinarily accomplished" and "very experienced" medical experts explained that, in certain circumstances and for certain women, intact D&E is safer than alternative procedures and necessary to protect women's health. *Carhart*, 331 F. Supp. 2d, at 1024–1027; see *Planned Parenthood*, 320 F. Supp. 2d, at 1001 ("[A]ll of the doctors who actually perform intact D&Es concluded that in their opinion and clinical judgment, intact D&Es remain the

safest option for certain individual women under certain individual health circumstances, and are significantly safer for these women than other abortion techniques, and are thus medically necessary."); cf. *ante*, at 31 ("Respondents presented evidence that intact D&E may be the safest method of abortion, for reasons similar to those adduced in *Stenberg*.").

According to the expert testimony plaintiffs introduced, the safety advantages of intact D&E are marked for women with certain medical conditions, for example, uterine scarring, bleeding disorders, heart disease, or compromised immune systems. See *Carhart*, 331 F. Supp. 2d, at 924–929, 1026–1027; *National Abortion Federation*, 330 F. Supp. 2d, at 472–473; *Planned Parenthood*, 320 F. Supp. 2d, at 992–994, 1001. Further, plaintiffs' experts testified that intact D&E is significantly safer for women with certain pregnancy-related conditions, such as placenta previa and accreta, and for women carrying fetuses with certain abnormalities, such as severe hydrocephalus. See *Carhart*, 331 F. Supp. 2d, at 924, 1026–1027; *National Abortion Federation*, 330 F. Supp. 2d, at 473–474; *Planned Parenthood*, 320 F. Supp. 2d, at 992–994, 1001. See also *Stenberg*, 530 U. S., at 929; Brief for ACOG as *Amicus Curiae* 2, 13–16.

Intact D&E, plaintiffs' experts explained, provides safety benefits over D&E by dismemberment for several reasons: *First*, intact D&E minimizes the number of times a physician must insert instruments through the cervix and into the uterus, and thereby reduces the risk of trauma to, and perforation of, the cervix and uterus—the most serious complication associated with nonintact D&E. See *Carhart*, 331 F. Supp. 2d, at 923–928, 1025; *National Abortion Federation*, 330 F. Supp. 2d, at 471; *Planned Parenthood*, 320 F. Supp. 2d, at 982, 1001. *Second*, removing the fetus intact, instead of dismembering it *in utero*, decreases the likelihood that fetal tissue will be retained

in the uterus, a condition that can cause infection, hemor-
rhage, and infertility. See *Carhart*, 331 F. Supp. 2d, at
923–928, 1025–1026; *National Abortion Federation*, 330
F. Supp. 2d, at 472; *Planned Parenthood*, 320 F. Supp. 2d,
at 1001. *Third*, intact D&E diminishes the chances of
exposing the patient's tissues to sharp bony fragments
sometimes resulting from dismemberment of the fetus.
See *Carhart*, 331 F. Supp. 2d, at 923–928, 1026; *National
Abortion Federation*, 330 F. Supp. 2d, at 471; *Planned
Parenthood*, 320 F. Supp. 2d, at 1001. *Fourth*, intact D&E
takes less operating time than D&E by dismemberment,
and thus may reduce bleeding, the risk of infection, and
complications relating to anesthesia. See *Carhart*, 331
F. Supp. 2d, at 923–928, 1026; *National Abortion Federa-
tion*, 330 F. Supp. 2d, at 472; *Planned Parenthood*, 320
F. Supp. 2d, at 1001. See also *Stenberg*, 530 U. S., at 928–
929, 932; Brief for ACOG as *Amicus Curiae* 2, 11–13.

　　Based on thoroughgoing review of the trial evidence and
the congressional record, each of the District Courts to
consider the issue rejected Congress' findings as unrea-
sonable and not supported by the evidence. See *Carhart*,
331 F. Supp. 2d, at 1008–1027; *National Abortion Federa-
tion*, 330 F. Supp. 2d, at 482, 488–491; *Planned Parent-
hood*, 320 F. Supp. 2d, at 1032. The trial courts concluded,
in contrast to Congress' findings, that "significant medical
authority supports the proposition that in some circum-
stances, [intact D&E] is the safest procedure." *Id.,* at 1033
(quoting *Stenberg*, 530 U. S., at 932); accord *Carhart*, 331
F. Supp. 2d, at 1008–1009, 1017–1018; *National Abortion
Federation*, 330 F. Supp. 2d, at 480–482;[5] cf. *Stenberg*, 530

　　　　　　　　　　　　　　　

　　[5] Even the District Court for the Southern District of New York,
which was more skeptical of the health benefits of intact D&E, see *ante*,
at 32, recognized: "[T]he Government's own experts disagreed with
almost all of Congress's factual findings"; a "significant body of medical
opinion" holds that intact D&E has safety advantages over nonintact
D&E; "[p]rofessional medical associations have also expressed their

U. S., at 932 ("[T]he record shows that significant medical authority supports the proposition that in some circumstances, [intact D&E] would be the safest procedure.").

The District Courts' findings merit this Court's respect. See, *e.g.*, Fed. Rule Civ. Proc. 52(a); *Salve Regina College* v. *Russell*, 499 U. S. 225, 233 (1991). Today's opinion supplies no reason to reject those findings. Nevertheless, despite the District Courts' appraisal of the weight of the evidence, and in undisguised conflict with *Stenberg*, the Court asserts that the Partial-Birth Abortion Ban Act can survive "when . . . medical uncertainty persists." *Ante*, at 33. This assertion is bewildering. Not only does it defy the Court's longstanding precedent affirming the necessity of a health exception, with no carve-out for circumstances of medical uncertainty, see *supra*, at 4–5; it gives short shrift to the records before us, carefully canvassed by the District Courts. Those records indicate that "the majority of highly-qualified experts on the subject believe intact D&E to be the safest, most appropriate procedure under certain circumstances." *Planned Parenthood*, 320 F. Supp. 2d, at 1034. See *supra*, at 9–10.

The Court acknowledges some of this evidence, *ante*, at 31, but insists that, because some witnesses disagreed with the ACOG and other experts' assessment of risk, the Act can stand. *Ante*, at 32–33, 37. In this insistence, the Court brushes under the rug the District Courts' well-supported findings that the physicians who testified that intact D&E is never necessary to preserve the health of a woman had slim authority for their opinions. They had no training for, or personal experience with, the intact D&E

———————

view that [intact D&E] may be the safest procedure for some women"; and "[t]he evidence indicates that the same disagreement among experts found by the Supreme Court in *Stenberg* existed throughout the time that Congress was considering the legislation, despite Congress's findings to the contrary." *National Abortion Federation*, 330 F. Supp. 2d, at 480–482.

procedure, and many performed abortions only on rare occasions. See *Planned Parenthood*, 320 F. Supp. 2d, at 980; *Carhart*, 331 F. Supp. 2d, at 1025; cf. *National Abortion Federation*, 330 F. Supp. 2d, at 462–464. Even indulging the assumption that the Government witnesses were equally qualified to evaluate the relative risks of abortion procedures, their testimony could not erase the "significant medical authority support[ing] the proposition that in some circumstances, [intact D&E] would be the safest procedure." *Stenberg*, 530 U. S., at 932.[6]

## II

### A

The Court offers flimsy and transparent justifications for upholding a nationwide ban on intact D&E *sans* any exception to safeguard a women's health. Today's ruling, the Court declares, advances "a premise central to [*Casey*'s] conclusion"—*i.e.*, the Government's "legitimate and substantial interest in preserving and promoting fetal

---

[6] The majority contends that "[i]f the intact D&E procedure is truly necessary in some circumstances, it appears likely an injection that kills the fetus is an alternative under the Act that allows the doctor to perform the procedure." *Ante*, at 34–35. But a "significant body of medical opinion believes that inducing fetal death by injection is almost always inappropriate to the preservation of the health of women undergoing abortion because it poses tangible risk and provides no benefit to the woman." *Carhart* v. *Ashcroft*, 331 F. Supp. 2d 805, 1028 (Neb. 2004) (internal quotation marks omitted), aff'd, 413 F. 3d 791 (CA8 2005). In some circumstances, injections are "absolutely [medically] contraindicated." 331 F. Supp. 2d, at 1027. See also *id.*, at 907–912; *National Abortion Federation*, 330 F. Supp. 2d, at 474–475; *Planned Parenthood*, 320 F. Supp. 2d, at 995–997. The Court also identifies medical induction of labor as an alternative. See *ante*, at 9. That procedure, however, requires a hospital stay, *ibid.*, rendering it inaccessible to patients who lack financial resources, and it too is considered less safe for many women, and impermissible for others. See *Carhart*, 331 F. Supp. 2d, at 940–949, 1017; *National Abortion Federation*, 330 F. Supp. 2d, at 468–470; *Planned Parenthood*, 320 F. Supp. 2d, at 961, n. 5, 992–994, 1000–1002.

life." *Ante*, at 14. See also *ante*, at 15 ("[W]e must determine whether the Act furthers the legitimate interest of the Government in protecting the life of the fetus that may become a child."). But the Act scarcely furthers that interest: The law saves not a single fetus from destruction, for it targets only a *method* of performing abortion. See *Stenberg*, 530 U. S., at 930. And surely the statute was not designed to protect the lives or health of pregnant women. *Id.*, at 951 (GINSBURG, J., concurring); cf. *Casey*, 505 U. S., at 846 (recognizing along with the State's legitimate interest in the life of the fetus, its "legitimate interes[t] . . . in protecting the *health of the woman*" (emphasis added)). In short, the Court upholds a law that, while doing nothing to "preserv[e] . . . fetal life," *ante*, at 14, bars a woman from choosing intact D&E although her doctor "reasonably believes [that procedure] will best protect [her]." *Stenberg*, 530 U. S., at 946 (STEVENS, J., concurring).

As another reason for upholding the ban, the Court emphasizes that the Act does not proscribe the nonintact D&E procedure. See *ante*, at 34. But why not, one might ask. Nonintact D&E could equally be characterized as "brutal," *ante,* at 26, involving as it does "tear[ing] [a fetus] apart" and "ripp[ing] off" its limbs, *ante,* at 4, 6. "[T]he notion that either of these two equally gruesome procedures . . . is more akin to infanticide than the other, or that the State furthers any legitimate interest by banning one but not the other, is simply irrational." *Stenberg*, 530 U. S., at 946–947 (STEVENS, J., concurring).

Delivery of an intact, albeit nonviable, fetus warrants special condemnation, the Court maintains, because a fetus that is not dismembered resembles an infant. *Ante,* at 28. But so, too, does a fetus delivered intact after it is terminated by injection a day or two before the surgical evacuation, *ante,* at 5, 34–35, or a fetus delivered through medical induction or cesarean, *ante,* at 9. Yet, the avail-

ability of those procedures—along with D&E by dismemberment—the Court says, saves the ban on intact D&E from a declaration of unconstitutionality. *Ante,* at 34–35. Never mind that the procedures deemed acceptable might put a woman's health at greater risk. See *supra*, at 13, and n. 6; cf. *ante*, at 5, 31–32.

Ultimately, the Court admits that "moral concerns" are at work, concerns that could yield prohibitions on any abortion. See *ante*, at 28 ("Congress could . . . conclude that the type of abortion proscribed by the Act requires specific regulation because it implicates additional ethical and moral concerns that justify a special prohibition."). Notably, the concerns expressed are untethered to any ground genuinely serving the Government's interest in preserving life. By allowing such concerns to carry the day and case, overriding fundamental rights, the Court dishonors our precedent. See, *e.g.*, *Casey*, 505 U. S., at 850 ("Some of us as individuals find abortion offensive to our most basic principles of morality, but that cannot control our decision. Our obligation is to define the liberty of all, not to mandate our own moral code."); *Lawrence* v. *Texas*, 539 U. S. 558, 571 (2003) (Though "[f]or many persons [objections to homosexual conduct] are not trivial concerns but profound and deep convictions accepted as ethical and moral principles," the power of the State may not be used "to enforce these views on the whole society through operation of the criminal law." (citing *Casey*, 505 U. S., at 850)).

Revealing in this regard, the Court invokes an antiabortion shibboleth for which it concededly has no reliable evidence: Women who have abortions come to regret their choices, and consequently suffer from "[s]evere depression and loss of esteem." *Ante*, at 29.[7] Because of women's

—————

[7] The Court is surely correct that, for most women, abortion is a painfully difficult decision. See *ante*, at 28. But "neither the weight of the

————

scientific evidence to date nor the observable reality of 33 years of legal abortion in the United States comports with the idea that having an abortion is any more dangerous to a woman's long-term mental health than delivering and parenting a child that she did not intend to have . . . ." Cohen, Abortion and Mental Health: Myths and Realities, 9 Guttmacher Policy Rev. 8 (2006); see generally Bazelon, Is There a Post-Abortion Syndrome? N. Y. Times Magazine, Jan. 21, 2007, p. 40. See also, *e.g.*, American Psychological Association, APA Briefing Paper on the Impact of Abortion (2005) (rejecting theory of a postabortion syndrome and stating that "[a]ccess to legal abortion to terminate an unwanted pregnancy is vital to safeguard both the physical and mental health of women"); Schmiege & Russo, Depression and Unwanted First Pregnancy: Longitudinal Cohort Study, 331 British Medical J. 1303 (2005) (finding no credible evidence that choosing to terminate an unwanted first pregnancy contributes to risk of subsequent depression); Gilchrist, Hannaford, Frank, & Kay, Termination of Pregnancy and Psychiatric Morbidity, 167 British J. of Psychiatry 243, 247–248 (1995) (finding, in a cohort of more than 13,000 women, that the rate of psychiatric disorder was no higher among women who terminated pregnancy than among those who carried pregnancy to term); Stodland, The Myth of the Abortion Trauma Syndrome, 268 JAMA 2078, 2079 (1992) ("Scientific studies indicate that legal abortion results in fewer deleterious sequelae for women compared with other possible outcomes of unwanted pregnancy. There is no evidence of an abortion trauma syndrome."); American Psychological Association, Council Policy Manual: (N)(I)(3), Public Interest (1989) (declaring assertions about widespread severe negative psychological effects of abortion to be "without fact"). But see Cougle, Reardon, & Coleman, Generalized Anxiety Following Unintended Pregnancies Resolved Through Childbirth and Abortion: A Cohort Study of the 1995 National Survey of Family Growth, 19 J. Anxiety Disorders 137, 142 (2005) (advancing theory of a postabortion syndrome but acknowledging that "no causal relationship between pregnancy outcome and anxiety could be determined" from study); Reardon et al., Psychiatric Admissions of Low-Income Women following Abortion and Childbirth, 168 Canadian Medical Assn. J. 1253, 1255–1256 (May 13, 2003) (concluding that psychiatric admission rates were higher for women who had an abortion compared with women who delivered); cf. Major, Psychological Implications of Abortion—Highly Charged and Rife with Misleading Research, 168 Canadian Medical Assn. J. 1257, 1258 (May 13, 2003) (critiquing Reardon study for failing to control for a host of differences between women in the delivery and abortion samples).

fragile emotional state and because of the "bond of love the mother has for her child," the Court worries, doctors may withhold information about the nature of the intact D&E procedure. *Ante*, at 28–29.[8] The solution the Court approves, then, is *not* to require doctors to inform women, accurately and adequately, of the different procedures and their attendant risks. Cf. *Casey*, 505 U. S., at 873 (plurality opinion) ("States are free to enact laws to provide a reasonable framework for a woman to make a decision that has such profound and lasting meaning."). Instead, the Court deprives women of the right to make an autonomous choice, even at the expense of their safety.[9]

———————

[8] Notwithstanding the "bond of love" women often have with their children, see *ante*, at 28, not all pregnancies, this Court has recognized, are wanted, or even the product of consensual activity. See *Casey*, 505 U. S., at 891 ("[O]n an average day in the United States, nearly 11,000 women are severely assaulted by their male partners. Many of these incidents involve sexual assault."). See also Glander, Moore, Michielutte, & Parsons, The Prevalence of Domestic Violence Among Women Seeking Abortion, 91 Obstetrics & Gynecology 1002 (1998); Holmes, Resnick, Kilpatrick, & Best, Rape-Related Pregnancy; Estimates and Descriptive Characteristics from a National Sample of Women, 175 Am. J. Obstetrics & Gynecology 320 (Aug. 1996).

[9] Eliminating or reducing women's reproductive choices is manifestly *not* a means of protecting them. When safe abortion procedures cease to be an option, many women seek other means to end unwanted or coerced pregnancies. See, *e.g.*, World Health Organization, Unsafe Abortion: Global and Regional Estimates of the Incidence of Unsafe Abortion and Associated Mortality in 2000, pp. 3, 16 (4th ed. 2004) ("Restrictive legislation is associated with a high incidence of unsafe abortion" worldwide; unsafe abortion represents 13% of all "maternal" deaths); Henshaw, Unintended Pregnancy and Abortion: A Public Health Perspective, in A Clinician's Guide to Medical and Surgical Abortion 11, 19 (M. Paul, E. Lichtenberg, L. Borgatta, D. Grimes, & P. Stubblefield eds. 1999) ("Before legalization, large numbers of women in the United States died from unsafe abortions."); H. Boonstra, R. Gold, C. Richards, & L. Finer, Abortion in Women's Lives 13, and fig. 2.2 (2006) ("as late as 1965, illegal abortion still accounted for an estimated . . . 17% of all officially reported pregnancy-related deaths"; "[d]eaths from abortion declined dramatically after legalization").

This way of thinking reflects ancient notions about women's place in the family and under the Constitution— ideas that have long since been discredited. Compare, *e.g.*, *Muller* v. *Oregon*, 208 U. S. 412, 422–423 (1908) ("protective" legislation imposing hours-of-work limitations on women only held permissible in view of women's "physical structure and a proper discharge of her maternal funct[ion]"); *Bradwell* v. *State*, 16 Wall. 130, 141 (1873) (Bradley, J., concurring) ("Man is, or should be, woman's protector and defender. The natural and proper timidity and delicacy which belongs to the female sex evidently unfits it for many of the occupations of civil life. . . . The paramount destiny and mission of woman are to fulfil[l] the noble and benign offices of wife and mother."), with *United States* v. *Virginia*, 518 U. S. 515, 533, 542, n. 12 (1996) (State may not rely on "overbroad generalizations" about the "talents, capacities, or preferences" of women; "[s]uch judgments have . . . impeded . . . women's progress toward full citizenship stature throughout our Nation's history"); *Califano* v. *Goldfarb*, 430 U. S. 199, 207 (1977) (gender-based Social Security classification rejected because it rested on "archaic and overbroad generalizations" "such as assumptions as to [women's] dependency" (internal quotation marks omitted)).

Though today's majority may regard women's feelings on the matter as "self-evident," *ante*, at 29, this Court has repeatedly confirmed that "[t]he destiny of the woman must be shaped . . . on her own conception of her spiritual imperatives and her place in society." *Casey*, 505 U. S., at 852. See also *id.*, at 877 (plurality opinion) ("[M]eans chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it."); *supra*, at 3–4.

## B

In cases on a "woman's liberty to determine whether to

[continue] her pregnancy," this Court has identified viability as a critical consideration. See *Casey*, 505 U. S., at 869–870 (plurality opinion). "[T]here is no line [more workable] than viability," the Court explained in *Casey*, for viability is "the time at which there is a realistic possibility of maintaining and nourishing a life outside the womb, so that the independent existence of the second life can in reason and all fairness be the object of state protection that now overrides the rights of the woman. . . . In some broad sense it might be said that a woman who fails to act before viability has consented to the State's intervention on behalf of the developing child." *Id.*, at 870.

Today, the Court blurs that line, maintaining that "[t]he Act [legitimately] appl[ies] both previability and postviability because . . . a fetus is a living organism while within the womb, whether or not it is viable outside the womb." *Ante*, at 17. Instead of drawing the line at viability, the Court refers to Congress' purpose to differentiate "abortion and infanticide" based not on whether a fetus can survive outside the womb, but on where a fetus is anatomically located when a particular medical procedure is performed. See *ante*, at 28 (quoting Congressional Findings (14)(G), in notes following 18 U. S. C. §1531 (2000 ed., Supp. IV), p. 769).

One wonders how long a line that saves no fetus from destruction will hold in face of the Court's "moral concerns." See *supra*, at 15; cf. *ante*, at 16 (noting that "[i]n this litigation" the Attorney General "does not dispute that the Act would impose an undue burden if it covered standard D&E"). The Court's hostility to the right *Roe* and *Casey* secured is not concealed. Throughout, the opinion refers to obstetrician-gynecologists and surgeons who perform abortions not by the titles of their medical specialties, but by the pejorative label "abortion doctor." *Ante*, at 14, 24, 25, 31, 33. A fetus is described as an "unborn child," and as a "baby," *ante,* at 3, 8; second-trimester,

previability abortions are referred to as "late-term," *ante,* at 26; and the reasoned medical judgments of highly trained doctors are dismissed as "preferences" motivated by "mere convenience," *ante,* at 3, 37. Instead of the heightened scrutiny we have previously applied, the Court determines that a "rational" ground is enough to uphold the Act, *ante*, at 28, 37. And, most troubling, *Casey*'s principles, confirming the continuing vitality of "the essential holding of *Roe,*" are merely "assume[d]" for the moment, *ante*, at 15, 31, rather than "retained" or "reaffirmed," *Casey*, 505 U. S., at 846.

## III
### A

The Court further confuses our jurisprudence when it declares that "facial attacks" are not permissible in "these circumstances," *i.e.*, where medical uncertainty exists. *Ante*, at 37; see *ibid.* ("In an as-applied challenge the nature of the medical risk can be better quantified and balanced than in a facial attack."). This holding is perplexing given that, in materially identical circumstances we held that a statute lacking a health exception was unconstitutional on its face. *Stenberg*, 530 U. S., at 930; see *id.*, at 937 (in facial challenge, law held unconstitutional because "significant body of medical opinion believes [the] procedure may bring with it greater safety for *some patients*" (emphasis added)). See also *Sabri* v. *United States*, 541 U. S. 600, 609–610 (2004) (identifying abortion as one setting in which we have recognized the validity of facial challenges); Fallon, Making Sense of Overbreadth, 100 Yale L. J. 853, 859, n. 29 (1991) ("[V]irtually all of the abortion cases reaching the Supreme Court since *Roe* v. *Wade*, 410 U. S. 113 (1973), have involved facial attacks on state statutes, and the Court, whether accepting or rejecting the challenges on the merits, has typically accepted this framing of the question

presented."). Accord Fallon, As-Applied and Facial Challenges and Third-Party Standing, 113 Harv. L. Rev. 1321, 1356 (2000); Dorf, Facial Challenges to State and Federal Statutes, 46 Stan. L. Rev. 235, 271–276 (1994).

Without attempting to distinguish *Stenberg* and earlier decisions, the majority asserts that the Act survives review because respondents have not shown that the ban on intact D&E would be unconstitutional "in a large fraction of relevant cases." *Ante*, at 38 (citing *Casey*, 505 U. S., at 895). But *Casey* makes clear that, in determining whether any restriction poses an undue burden on a "large fraction" of women, the relevant class is *not* "all women," nor "all pregnant women," nor even all women "seeking abortions." 505 U. S., at 895. Rather, a provision restricting access to abortion, "must be judged by reference to those [women] for whom it is an actual rather than an irrelevant restriction," *ibid*. Thus the absence of a health exception burdens *all* women for whom it is relevant—women who, in the judgment of their doctors, require an intact D&E because other procedures would place their health at risk.[10] Cf. *Stenberg*, 530 U. S., at 934 (accepting the "relative rarity" of medically indicated intact D&Es as true but not "highly relevant"—for "the health exception question is whether protecting women's health requires an exception for those infrequent occasions"); *Ayotte*, 546 U. S., at 328 (facial challenge entertained where "[i]n some very small percentage of cases . . . women . . . need immediate abortions to avert serious, and often irreversible damage to their health"). It makes no sense to conclude that this facial challenge fails because respondents have not shown that a health exception is necessary for a large fraction of

———————

[10] There is, in short, no fraction because the numerator and denominator are the same: The health exception reaches only those cases where a woman's health is at risk. Perhaps for this reason, in mandating safeguards for women's health, we have never before invoked the "large fraction" test.

second-trimester abortions, including those for which a health exception is unnecessary: The very purpose of a health *exception* is to protect women in *exceptional* cases.

B

If there is anything at all redemptive to be said of to-day's opinion, it is that the Court is not willing to foreclose entirely a constitutional challenge to the Act. "The Act is open," the Court states, "to a proper as-applied challenge in a discrete case." *Ante*, at 38; see *ante,* at 37 ("The Government has acknowledged that preenforcement, as-applied challenges to the Act can be maintained."). But the Court offers no clue on what a "proper" lawsuit might look like. See *ante*, at 37–38. Nor does the Court explain why the injunctions ordered by the District Courts should not remain in place, trimmed only to exclude instances in which another procedure would safeguard a woman's health at least equally well. Surely the Court cannot mean that no suit may be brought until a woman's health is immediately jeopardized by the ban on intact D&E. A woman "suffer[ing] from medical complications," *ante*, at 38, needs access to the medical procedure at once and cannot wait for the judicial process to unfold. See *Ayotte*, 546 U. S., at 328.

The Court appears, then, to contemplate another law-suit by the initiators of the instant actions. In such a second round, the Court suggests, the challengers could succeed upon demonstrating that "in discrete and well-defined instances a particular condition has or is likely to occur in which the procedure prohibited by the Act must be used." *Ante*, at 37. One may anticipate that such a preenforcement challenge will be mounted swiftly, to ward off serious, sometimes irremediable harm, to women whose health would be endangered by the intact D&E prohibition.

The Court envisions that in an as-applied challenge,

"the nature of the medical risk can be better quantified and balanced." *Ibid.* But it should not escape notice that the record already includes hundreds and hundreds of pages of testimony identifying "discrete and well-defined instances" in which recourse to an intact D&E would better protect the health of women with particular conditions. See *supra*, at 10–11. Record evidence also documents that medical exigencies, unpredictable in advance, may indicate to a well-trained doctor that intact D&E is the safest procedure. See *ibid.* In light of this evidence, our unanimous decision just one year ago in *Ayotte* counsels against reversal. See 546 U. S., at 331 (remanding for reconsideration of the remedy for the absence of a health exception, suggesting that an injunction prohibiting unconstitutional applications might suffice).

The Court's allowance only of an "as-applied challenge in a discrete case," *ante*, at 38—jeopardizes women's health and places doctors in an untenable position. Even if courts were able to carve-out exceptions through piecemeal litigation for "discrete and well-defined instances," *ante*, at 37, women whose circumstances have not been anticipated by prior litigation could well be left unprotected. In treating those women, physicians would risk criminal prosecution, conviction, and imprisonment if they exercise their best judgment as to the safest medical procedure for their patients. The Court is thus gravely mistaken to conclude that narrow as-applied challenges are "the proper manner to protect the health of the woman." Cf. *ibid.*

## IV

As the Court wrote in *Casey*, "overruling *Roe*'s central holding would not only reach an unjustifiable result under principles of *stare decisis*, but would seriously weaken the Court's capacity to exercise the judicial power and to function as the Supreme Court of a Nation dedicated to

the rule of law." 505 U. S., at 865. "[T]he very concept of the rule of law underlying our own Constitution requires such continuity over time that a respect for precedent is, by definition, indispensable." *Id.*, at 854. See also *id.*, at 867 ("[T]o overrule under fire in the absence of the most compelling reason to reexamine a watershed decision would subvert the Court's legitimacy beyond any serious question.").

Though today's opinion does not go so far as to discard *Roe* or *Casey*, the Court, differently composed than it was when we last considered a restrictive abortion regulation, is hardly faithful to our earlier invocations of "the rule of law" and the "principles of *stare decisis*." Congress imposed a ban despite our clear prior holdings that the State cannot proscribe an abortion procedure when its use is necessary to protect a woman's health. See *supra*, at 7, n. 4. Although Congress' findings could not withstand the crucible of trial, the Court defers to the legislative override of our Constitution-based rulings. See *supra*, at 7–9. A decision so at odds with our jurisprudence should not have staying power.

In sum, the notion that the Partial-Birth Abortion Ban Act furthers any legitimate governmental interest is, quite simply, irrational. The Court's defense of the statute provides no saving explanation. In candor, the Act, and the Court's defense of it, cannot be understood as anything other than an effort to chip away at a right declared again and again by this Court—and with increasing comprehension of its centrality to women's lives. See *supra*, at 3, n. 2; *supra,* at 7, n. 4. When "a statute burdens constitutional rights and all that can be said on its behalf is that it is the vehicle that legislators have chosen for expressing their hostility to those rights, the burden is undue." *Stenberg*, 530 U. S., at 952 (GINSBURG, J., concurring) (quoting *Hope Clinic* v. *Ryan*, 195 F. 3d 857, 881 (CA7 1999) (Posner, C. J., dissenting)).

GINSBURG, J., dissenting

\*     \*     \*

For the reasons stated, I dissent from the Court's disposition and would affirm the judgments before us for review.